# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

April 9, 2009

Charles R. Fulbruge III
Clerk

No. 07-11134

CQ INC

Plaintiff-Appellant

v.

TXU MINING COMPANY LP

Defendant-Appellee

Appeal from the United States District Court
for the Northern District of Texas

Before WIENER, GARZA, and DeMOSS, Circuit Judges.

EMILIO M. GARZA, Circuit Judge:

In this contract dispute, Appellant CQ, Inc. ("CQ") appeals the district court's resolution of the parties' cross-motions for summary judgment in favor of Appellee TXU Mining Company, L.P. ("TXU"). CQ also appeals the exclusion of its expert testimony on damages. For the following reasons, we affirm the judgment of the district court.

## I

This dispute arises out of a failed partnership to clean lignite, a type of low-grade coal. TXU mines lignite and sells it for commercial use as fuel. In November of 2004, TXU began to explore cleaning lignite at several of its mines. TXU sent out a request for bids ("RFB") to several companies that specialized in

such cleaning, including CQ. The RFB contemplated the formation of a "Key Alliance Agreement," by which a chosen company would construct and operate lignite-cleaning facilities at TXU's Twin Oak and Oak Hill mines for a period of five years. The RFB cautioned that, even once a "successful" bidder was selected, TXU reserved the right to further negotiate the proposed contract. Prior to bidding, TXU required CQ and the other companies to sign a "Confidentiality Agreement" that prevented either party from using confidential information disclosed during negotiations for any purpose "except the analysis, investigation, and evaluation of the proposed business relationship." CQ submitted a timely bid in response to the RFB.[1] Subsequently, TXU proposed various addenda to the original RFB, and CQ and the other bidders submitted modified bids in response.

In late February of 2005, TXU called CQ and indicated that CQ had been selected as the preferred alliance partner. The significance of this "selection" is hotly disputed. CQ contends that TXU orally agreed to the five-year Alliance Agreement discussed in the bid documents. TXU contends that it merely selected CQ from among the available bidders and intended to further negotiate the final contract, as contemplated in the RFB. It is undisputed that the parties never entered a written contract finalizing the purported Alliance Agreement.

Over the next few months, CQ continued to work with and advise TXU on the proposed lignite-cleaning operation. CQ periodically asked when a long-term contract would be formalized in writing. TXU responded that it had not yet decided to build any cleaning facilities and would compensate CQ if TXU ultimately decided against the project. In mid-April of 2005, the parties

---

[1] TXU's initial RFB indicated that TXU intended to (1) focus on cleaning low-quality "waste lignite" at the Twin Oak Mine and (2) only clean high-quality "ROM lignite" if economically feasible. CQ's initial bid proposed the opposite approach and recommended that TXU primarily focus on cleaning ROM lignite at the initial facility.

exchanged drafts of an "Interim Services Contract" by which TXU would pay CQ a consulting fee for its services if the final Alliance Agreement failed to materialize. In mid-June of 2005, TXU requested documentation of the expenses undertaken by CQ until that point. CQ submitted an invoice for $110,419.17 in services. In early July of 2005, TXU terminated the relationship with CQ. TXU ultimately built and operated its own lignite-cleaning facility at the Oak Hill Mine, but chose not to clean lignite at the Twin Oak Mine.

After TXU terminated the relationship, CQ filed suit in state court for, *inter alia*, (1) breach of the purported five-year Alliance Agreement, (2) breach of the Confidentiality Agreement, (3) *quantum meruit*, and (4) misappropriation of trade secrets. TXU removed the case to federal court pursuant to diversity jurisdiction. The parties agreed that Texas law controlled the substantive claims.

The parties filed cross-motions for summary judgment. CQ moved for partial summary judgment in favor of its contract claims, but the district court found that disputes of material fact precluded judgment as to either claim. TXU moved for summary judgment against all of CQ's claims. In response, the district court dismissed CQ's claim for breach of the purported Alliance Agreement, finding that the statute of frauds barred enforcement of the Agreement. The court also dismissed the majority of CQ's trade-secret claims, including the claim that TXU misappropriated CQ's recommendation to focus on cleaning ROM lignite rather than waste lignite. The court reasoned that CQ had failed to provide any evidence that TXU used the ROM recommendation. As to CQ's remaining claims, the district court denied TXU's request for summary judgment.

As the trial approached, TXU filed a motion to exclude the opinions and reports of Ronald Vollmar, CQ's expert on damages. The motion also sought to prohibit any evidence supporting a damages calculation other than $110,419.17, the amount stated in CQ's invoice. TXU argued that CQ failed to disclose any

alternative computation of damages during discovery as required by FED. R. CIV. P. 26(a)(1)(A)(iii). After considering the parties' briefing, the district court both excluded Vollmar's reports and limited further evidence of damages as requested by TXU. Subsequently, the parties entered a settlement by which TXU paid CQ's $110,419.17 in fees and CQ dismissed its claims for promissory estoppel and injunctive relief.

Given the settlement of the fee liability and the court's order precluding further evidence on damages, TXU moved for a take-nothing judgment on CQ's remaining claims for breach of the Confidentiality Agreement, misappropriation of trade secrets, and *quantum meruit*. The district court granted the motion and entered a take-nothing judgment. CQ now appeals, arguing that the district court committed several errors in (1) resolving the parties' cross-motions for summary judgment and (2) excluding CQ's evidence of damages.

## II

CQ raises several challenges to the district court's resolution of the parties' cross-motions for summary judgment. "We review a district court's grant or denial of summary judgment *de novo*, applying the same standard as the district court." *Robinson v. Orient Marine Co. Ltd.*, 505 F.3d 364, 365 (5th Cir. 2007). Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). The movant "has the initial burden of informing the court of the basis for its motion and identifying those parts of the record that demonstrate the absence of a genuine issue of material fact." *U.S. v. $92,203.00 in U.S. Currency*, 537 F.3d 504, 507 (5th Cir. 2008). Once this initial burden has been met, the burden shifts to the nonmovant "to demonstrate the existence of a genuine issue of material fact." *Id.* All reasonable inferences are drawn in favor of the nonmovant. *Robinson*, 505 F.3d at 366.

**A**

CQ first contends that the district court erred in denying CQ's motion for summary judgment on its claim that TXU breached the Confidentiality Agreement by using CQ's confidential information. The district court denied the motion because it found that "issues of material fact remain[ed]" as to whether CQ indicated that its information was "confidential" as required by the Confidentiality Agreement. After reviewing the record, we agree that there is a genuine dispute as to whether CQ marked the information as confidential or otherwise disclosed the information "in a manner consistent with its confidential or proprietary nature." Namely, the documents at issue were not expressly marked "confidential" on all relevant pages, and the parties provide conflicting accounts on whether a confidential intent was expressed. Accordingly, the district court properly held that a genuine issue of material fact precluded summary judgment. *See* FED. R. CIV. P. 56(c).

**B**

CQ next contends that the district court erred in granting summary judgment against CQ's misappropriation claim as to its sixth alleged trade secret—CQ's recommendation that TXU focus on ROM lignite rather than waste lignite (the "ROM strategy"). To prevail on a misappropriation claim under Texas law, "a plaintiff must show that (1) a trade secret existed, (2) the trade secret was acquired through a breach of a confidential relationship or discovered by improper means, and (3) the defendant *used* the trade secret without authorization from the plaintiff." *Gaia Techs. Inc. v. Recycled Prods. Corp.*, 175 F.3d 365, 376 (5th Cir. 1999) (emphasis added).

CQ alleged that the ROM strategy was a trade secret that was misappropriated by TXU. TXU moved for summary judgment on this point, arguing that (1) the ROM strategy was not a trade secret under Texas law and (2) there was no evidence that TXU actually used the ROM strategy. The district

court granted summary judgment on the latter ground, reasoning that CQ's response brief failed to provide "more than a scintilla of evidence that TXU [was] using this information."

CQ contends that it provided sufficient evidence to create a genuine issue as to whether TXU used the ROM strategy. In order to avoid summary judgment, the nonmovant must identify specific facts within the record that demonstrate the existence of a genuine issue of material fact. *Smith ex rel. Estate of Smith v. United States*, 391 F.3d 621, 625 (5th Cir. 2004). The party must also "articulate the precise manner in which the submitted or identified evidence supports his or her claim." *Id*. "[W]hen evidence exists in the summary judgment record but the nonmovant *fails even to refer to it* in the response to the motion for summary judgment, that evidence is not properly before the district court." *Id*. (quoting *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003)) (emphasis added).

Here, CQ's response to TXU's motion for summary judgment included a short paragraph with the heading "TXU improperly used CQ's secret information." This paragraph lacked any argument that TXU used the ROM strategy in particular; instead, it cross-cited to a span of four pages in CQ's own motion for partial summary judgment. On one of the referenced pages, CQ specifically argues that TXU used the ROM strategy and provides supporting citations to the record. Substantively, the cited evidence creates at least a genuine issue as to whether TXU used the ROM strategy.[2] However, TXU contends that the evidence may not be considered because the relevant citations were not included in the body of CQ's response brief. *See Smith*, 391 F.3d at 625.

---

[2] CQ cited to deposition testimony indicating that (1) TXU was initially planning to clean waste lignite, (2) CQ recommended focusing on ROM lignite, (3) CQ explained the benefits of cleaning ROM lignite to TXU, and (4) TXU ultimately moved toward cleaning ROM lignite. This evidence is sufficient to create a genuine dispute as to whether TXU used the analysis underlying the ROM strategy in planning and operating its current facilities.

The district court apparently agreed, as it failed to acknowledge the cross-citation or the dispositive evidence in the record.

This Circuit has never addressed whether a nonmovant may satisfy its responsive burden by cross-citing to its own motion for summary judgment. While we decline to endorse a bright-line rule, we hold that CQ's response was sufficient in this case: CQ's response brief alleged that there was a material issue of fact and supported this allegation with a targeted cross-citation to CQ's own motion. The cross-cited pages contained argument and citations to the record that unambiguously created the alleged issue of fact. Thus, we cannot say that CQ "fail[ed] even to refer to" the relevant argument and evidence in its response brief. *See Smith*, 391 F.3d at 625; *see also Fair Hous. Council of Riverside County, Inc. v. Riverside Two*, 249 F.3d 1132, 1135–37 (9th Cir. 2001) (holding that a district court must consider the evidence offered in a nonmovant's own cross-motion for summary judgment). Accordingly, the district court erred by refusing to consider the cited evidence of TXU's use of the ROM strategy.[3]

Nonetheless, we may affirm a grant of summary judgment "on any ground presented to the district court for consideration, even though it may not have formed the basis for the district court's decision." *Gulf Island, IV v. Blue Streak Marine, Inc.*, 940 F.2d 948, 952 (5th Cir. 1991). Here, we agree with TXU's alternative argument that the ROM strategy was not a trade secret under Texas law. "A trade secret is any formula, pattern, device or compilation of information which is used in one's business and presents an opportunity to obtain an advantage over competitors who do not know or use it." *Computer Assocs. Int'l, Inc. v. Altai, Inc.*, 918 S.W.2d 453, 455 (Tex. 1996) (quoting from the RESTATEMENT OF TORTS § 757 (1939)). "It differs from other secret information in a business in that it is not simply information as to single or ephemeral events

---

[3] Despite our holding, we note that the better practice for litigants is to include the relevant argument and record citations in the body of the response brief.

in the conduct of the business . . . . A trade secret is a process or device for continuous use in the operation of the business." RESTATEMENT OF TORTS § 757, cmt. b.

The ROM strategy does not qualify as a trade secret under Texas law. As defined by CQ, the "ROM strategy" was CQ's recommendation that TXU focus on cleaning ROM lignite instead of waste lignite at the Twin Oak Mine. CQ does not allege that the ROM strategy itself involved a previously unknown process or method for cleaning lignite. In fact, the record indicates that TXU contemplated cleaning ROM lignite when it sent its initial request for bids. The ROM strategy was essentially a strategic recommendation between two generally known alternatives. While this recommendation may have been based on CQ's valuable experience and effort, it was not a "process or device for continuous use" that offered TXU an advantage over its competitors. *See id*. Moreover, the record indicates that the recommendation was tailored to TXU's initial cleaning project, not to the mining industry generally. *See id*. (explaining that a trade secret "is not simply information as to single or ephemeral events"). Accordingly, the ROM strategy was not a trade secret under Texas law, and the district court did not err in granting summary judgment against CQ's misappropriation claim.

## C

CQ next contends that the district court erred in granting summary judgment against its claim for breach of the purported Alliance Agreement. The district court found that the statute of frauds barred any enforcement of the Alliance Agreement.

Under the Texas statute of frauds, an agreement that cannot be performed within one year is unenforceable unless it is documented in writing and signed by the person to be charged. TEX. BUS. & COM. CODE § 26.01(a), (b)(6) (Vernon 2002). CQ's complaint alleged that TXU orally agreed to a five-year contract for services known as the Clean Coal Alliance Agreement. CQ raised several

arguments in favor of the enforceability of the purported oral agreement, all of which were rejected by the district court on summary judgment. CQ now reiterates two of these arguments.

First, CQ contends that the oral agreement was sufficiently documented in writing to satisfy the statute of frauds. Under Texas law, an "oral agreement must be evidenced by a written memorandum which is complete within itself in every material detail, and which contains all of the essential elements of the agreement, so that the contract can be ascertained from the writings without resorting to oral testimony." *Conner v. Lavaca Hosp. Dist.*, 267 F.3d 426, 432 (5th Cir. 2001) (internal quotation marks omitted). This memorandum may consist of several different writings between the parties. *Cent. Power & Light Co. v. Del Mar Conservation Dist.*, 594 S.W.2d 782, 789 (Tex. Civ. App.—San Antonio 1980, writ ref'd n.r.e.). However, at least one writing must indicate the existence of a final contract; evidence of mere negotiation is not sufficient. *See Southmark Corp. v. Life Investors, Inc.*, 851 F.2d 763, 767 (5th Cir. 1988) ("Under Texas law . . . a writing that contemplates a contract to be made in the future does not satisfy the requirements of the statute of frauds. Indeed, it is common sense that 'futuristic' language in a writing is not confirmatory of a contract already in existence." (internal quotation marks omitted)).

CQ primarily relies on one document to establish that TXU agreed to enter the five-year Alliance Agreement: In May of 2005, TXU's David Watkins sent an email to TXU's Don Clevenger seeking Clevenger's assistance in preparing the Interim Services Contract between CQ and TXU. The "Watkins email" provided as follows:

> Per the information below, we are requesting your guidance in completing a contract with CQ, Inc.:

> I have been working with TXU Mining on a project regarding Clean Coal Technology. We went through a formal bid process and

9

through that process determined that the company 'CQ Inc.' is the best company for TXU to go forward with on the Clean Coal Technology project. The intent is to *eventually* form an Alliance or Partnership Agreement with CQ Inc. in regard to Clean Coal Technology. The Alliance would be contingent upon the results of testing and work we will be doing this year and upon TXU's overall fuel strategy. In discussions so far with CQ, Inc., both parties have agreed that CQ Inc. will be performing work this year that will provide a basis for the *forthcoming* Alliance Agreement (if the Clean Coal Technology methodology is a workable solution and if it fits into TXU's overall fuel strategy.) In discussions so far with CQ, it has been agreed that the costs for the work that CQ performs this year will be rolled over into the final Alliance compensation rates, *if the Alliance is determined to be a 'go project.'* If the Alliance does not happen, then TXU Mining would compensate CQ for the work that they have done this year. CQ is to document the costs accrued this year and at the end of the year, TXU will compensate CQ for those costs. (emphases added)

CQ argues that the Watkins email, in combination with the bid documents, creates a memorandum of the five-year Alliance Agreement. However, the Watkins email unambiguously disavows the present existence of the Alliance Agreement. According to the plain text of the document, the parties were seeking to enter an interim-services agreement precisely because they had not yet agreed on a long-term arrangement. The intent was to "eventually" form an agreement "if the Alliance [was] determined to be a 'go project.'" This type of contingent language does not satisfy the statute of frauds because it "is not confirmatory of a contract already in existence." *See Southmark Corp.*, 851 F.2d at 767 (internal quotation marks omitted). CQ's other written evidence is similarly inconclusive. CQ has failed to offer a writing that demonstrates or even suggests that the purported Alliance Agreement ever left the negotiation stage. Accordingly, CQ's first argument lacks merit.

Second, CQ contends that its partial performance of the Alliance Agreement renders the oral contract enforceable. Under the partial-performance

10

exception to the statute of frauds, a court may enforce an oral contract that has been partially performed if enforcement is necessary to prevent a virtual fraud. *Exxon Corp. v. Breezevale Ltd.*, 82 S.W.3d 429, 439 (Tex. App.—Dallas 2002, pet. denied). However, in order for this exception to apply, "[t]he partial performance must be unequivocally referable to the agreement and corroborative of the fact that a contract actually was made." *Id.* (internal quotation marks omitted). "The acts of performance relied upon to take a parol contract out of the statute of frauds must be such as could have been done with *no other design* than to fulfill the particular agreement sought to be enforced . . . ." *Id.* at 439–40 (emphasis added).

Here, CQ claims that the four months of work it performed following the bid award constituted partial performance of the Alliance Agreement. However, as indicated by the Watkins email, the parties specifically contemplated that CQ would provide such services prior to the possible entry of the Alliance Agreement. Thus, CQ's work was not "unequivocally referable" to a five-year Alliance Agreement; it was equally referable to the Interim Services Contract contemplated in the Watkins email. CQ has failed to demonstrate conduct that "could have been done with no other design than to fulfill" the Alliance Agreement. *See Exxon Corp.*, 82 S.W.3d at 439–40.

Accordingly, the statute of frauds bars enforcement of the purported Alliance Agreement. The district court did not err in granting summary judgment against CQ's breach-of-contract claim.

### III

CQ also appeals the district court's exclusion of CQ's evidence of damages prior to trial. The district court excluded (1) two written reports from CQ's expert, Ron Vollmar, and (2) various non-expert evidence of damages pursuant to FED. R. CIV. P. 37(c)(1). We review a district court's decision to exclude expert testimony for abuse of discretion. *Smith v. Goodyear Tire & Rubber Co.*, 495 F.3d

224, 226 (5th Cir. 2007). "District courts enjoy wide latitude in determining the admissibility of expert testimony, and the discretion of the trial judge and his or her decision will not be disturbed on appeal unless manifestly erroneous." *Id*. at 227 (quoting *Watkins v. Telsmith, Inc.*, 121 F.3d 984, 988 (5th Cir. 1997)). We also review a district court's decision to exclude evidence pursuant to Rule 37(c) for abuse of discretion. *See Betzel v. State Farm Lloyds*, 480 F.3d 704, 707 (5th Cir. 2007).

## A

CQ first challenges the exclusion of Vollmar's initial expert report. Vollmar is a former accountant and a frequent expert on damages issues. His initial report purported to quantify (1) CQ's lost-profit damages from TXU's breach of the Alliance Agreement and (2) CQ's reasonable-royalty damages from TXU's misappropriation of various trade secrets. Following the release of the initial report in January of 2007, the district court dismissed the contract and trade-secret claims that provided the substantial basis for the report. Accordingly, the initial report was no longer relevant at the time of TXU's motion, and its exclusion was proper. *See* FED. R. EVID. 702; *Smith*, 495 F.3d at 227 ("When evaluating expert testimony, the overarching concern is whether or not it is relevant and reliable.").

## B

CQ next appeals the exclusion of Vollmar's supplemental report. Following the dismissal of the claims underlying the initial report, Vollmar produced a supplemental report on damages in September of 2007. The supplemental report purported to measure the damages resulting from TXU's breach of the Confidentiality Agreement. The report focused on TXU's alleged use of the ROM strategy. Vollmar reasoned that, had TXU not breached the Confidentiality Agreement by using the ROM strategy, CQ could have expected to negotiate a reasonable royalty for use of the strategic recommendation. Vollmar calculated

this royalty rate at $0.32 per ton, and then multiplied the rate by various projections of output disclosed by TXU. Using this formula, the supplemental report concluded that CQ could have expected approximately $17 million in royalties over a ten-year period if TXU had not breached the Confidentiality Agreement.

The district court excluded the supplemental report because it determined that (1) Vollmar's reasonable-royalty approach was "not supported by Texas law," (2) Vollmar's opinion was inadmissible under Rule 702, and (3) the court had previously ruled that TXU's had not used the ROM strategy. For the reasons stated in Part II.B of this opinion, the district court's summary-judgment ruling on TXU's use of the ROM strategy was erroneous. Accordingly, we consider only the court's conclusions that the supplemental report was not supported by Texas law and was inadmissible under Rule 702.[4]

CQ contends that Texas law allows the recovery of a hypothetical royalty when a party breaches a confidentiality agreement. We disagree. Under Texas law, contract damages are defined by the plaintiff's actual loss:

> The universal rule for measuring damages for the breach of a contract is just compensation for the loss or damage *actually sustained*. By the operation of that rule, a party generally should be awarded *neither less nor more than his actual damages*. A nonbreaching party is generally entitled to all actual damages necessary to put it in the same economic position in which it would have been had the contract not been breached.

*Abraxas Petrol. Corp. v. Hornburg*, 20 S.W.3d 741, 760 (Tex. App.—El Paso 2000, no pet.) (internal citations omitted and emphases added). Moreover, "[a] party may not recover damages for breach of contract if those damages are

---

[4] We review the district court's decision to exclude evidence pursuant to Rule 702 for abuse of discretion. *Smith*, 495 F.3d at 226. However, the court's ruling based on its interpretation of Texas law arguably presents an issue of law. Accordingly, we assume *arguendo* that we review this aspect of the ruling *de novo*. *Cf. Lubke v. City of Arlington*, 455 F.3d 489, 498 (5th Cir. 2006).

remote, contingent, speculative, or conjectural." *City of Dallas v. Villages of Forest Hills, L.P., Phase I*, 931 S.W.2d 601, 605 (Tex. App.—Dallas 1996, no writ).

CQ contends that the royalty calculus represents a reasonable estimation of its actual loss. However, it requires numerous speculative leaps to conclude that the parties would have negotiated an ongoing licensing agreement absent a breach of the Confidentiality Agreement. *See Ramco Oil & Gas Ltd. v. Anglo-Dutch (Tenge) L.L.C.*, 207 S.W.3d 801, 808 (Tex. App.—Houston [14th Dist.] 2006, pet. denied) ("Plaintiffs cannot recover profits that are largely speculative . . . ."). Moreover, Vollmar's assumptions in creating the hypothetical licensing agreement, such as the ten-year duration, appear to be wholly conjectural. Nowhere in the Confidentiality Agreement is there any discussion of royalties or licensing.[5] *Cf. John Wood Group USA, Inc. v. ICO, Inc.*, 26 S.W.3d 12, 23 (Tex. App.—Houston [1st Dist.] 2000, pet. denied) (holding that a plaintiff may not recover damages under a non-binding sales agreement based on the defendant's breach of a binding confidentiality provision).

Accordingly, the district court did not err in determining that the damages computation in Vollmar's supplemental report was not supported by Texas contract law. A hypothetical licensing agreement based on speculation and conjecture cannot be said to reliably measure CQ's actual loss from a breach of the Confidentiality Agreement.[6] *See City of Dallas*, 931 S.W.2d at 605 (noting

---

[5] CQ argues that *Qaddura v. Indo-European Foods, Inc.*, 141 S.W.3d 882, 888–90 (Tex. App.—Dallas 2004, pet. denied), permits the recovery of a royalty when a party breaches a confidentiality or non-use contract. However, *Qaddura* involved the disgorgement of actual profits over a fixed period of time, not a hypothetical long-term licensing agreement. *Id.* Furthermore, the contract at issue in *Qaddura* was a trademark-lawsuit settlement. Thus, the court specifically looked to trademark remedies under the Lanham Act—including disgorgement of profits from the infringer's use of the trademark—in order to prevent future defendants from "avoid[ing] trademark remedies . . . merely by agreeing to stop infringing only to breach that agreement once the trademark suit is dismissed with prejudice." *Id.* at 889.

[6] Although CQ primarily characterizes Vollmar's computation as a measurement of CQ's benefit-of-the-bargain damages, CQ alternatively argues that the report measures CQ's

that contract damages may not be "remote, contingent, speculative, or conjectural"). Moreover, based on the foregoing analysis and the speculative nature of the supplemental report, the district court did not abuse its discretion in excluding the report pursuant to Rule 702. *See Hathaway v. Bazany*, 507 F.3d 312, 318 (5th Cir. 2007) (affirming the district court's exclusion of expert testimony in part because it was based on "unsupported conjectures" and "speculative premises"); *Hammond v. Coleman Co.*, 209 F.3d 718, 2000 WL 283165, at \*1–2 (5th Cir. 2000) (table) (affirming the district court's exclusion of expert testimony as "too speculative to be admissible under Rule 702").

## C

Finally, CQ contends that the district court erred in excluding its other evidence of damages pursuant to FED. R. CIV. P. 26(a)(1)(A)(iii) and 37(c)(1). Prior to trial, TXU filed a motion in limine seeking to limit evidence of CQ's damages to $110,419.17—the amount indicated in CQ's invoice for work performed. CQ countered that it should be permitted to present evidence of various other damages calculations, including (1) Vollmar's reasonable-royalty opinion as evidence of damages from CQ's *quantum meruit* claim and (2) various non-expert evidence as to the amount of CQ's contract damages. However, the district court

---

"restitution interest." It is true that some Texas cases have stated that "[d]amages for breach of contract protect three interests: a restitution interest, a reliance interest, and an expectation interest." *O'Farrill Avila v. Gonzalez*, 974 S.W.2d 237, 247 (Tex. App.—San Antonio 1998, pet. denied). However, we do not believe that this tripartite formulation alters the "universal rule" limiting contract damages to the actual loss suffered by the plaintiff as a result of the breach. *See id.* ("In order to put the aggrieved party in the same position he or she would occupy if the other party had fully performed, each of these [three] interests must be protected."). Nor does it excuse the requirement that contract damages be non-speculative. *Cf. Granite Mgmt. Corp. v. United States*, 416 F.3d 1373, 1380–81 (Fed. Cir. 2005) (internal quotation marks omitted) (finding that the alleged "value conferred" on the breaching party was "too speculative and indeterminate" to serve as a measurement of contract damages). CQ has not identified any Texas case in which a party has recovered a hypothetical royalty as part of its restitution interest. Accordingly, the damages calculation in Vollmar's report—whether characterized as CQ's reliance, expectancy, or restitution interest—is not supported by Texas law.

concluded that CQ failed to provide notice of these alternative computations as required by Rule 26, and thus the court excluded further evidence pursuant to Rule 37.

Rule 26 provides that "a party must, without awaiting a discovery request, provide . . . a *computation* of each *category* of damages . . . [and] the documents or other evidentiary material, unless privileged or protected from disclosure, on which each computation is based." FED. R. CIV. P. 26(a)(1)(A)(iii) (emphasis added). Rule 37 provides that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." FED. R. CIV. P. 37(c)(1); *cf. KW Plastics v. U.S. Can Co.*, 131 F. Supp. 2d 1289, 1296 (M.D. Ala. 2001) (noting that an expert may not testify on unjust-enrichment damages when his Rule 26 report disclosed only a calculation for lost-profit damages). After a review of the record, we agree that CQ failed to properly disclose the "computations" for the various "categor[ies]" of damages it now complains of. Thus, we turn to whether the district court abused its discretion in excluding the evidence pursuant to Rule 37.

We consider four factors in determining whether the district court abused its discretion: (1) CQ's explanation for its failure to disclose the evidence, (2) the importance of the evidence, (3) the potential prejudice to TXU in allowing the evidence, and (4) the availability of a continuance. *See Betzel*, 480 F.3d at 707. Significantly, CQ has not offered any justification for its failure to disclose the damages calculations or their underlying evidence. While the evidence is clearly important to CQ, it is not essential to CQ's underlying recovery.[7] Moreover, given

---

[7] We note that this is not a case in which the district court's exclusion of the evidence constituted dismissal of the plaintiff's claims. *See E.E.O.C. v. Gen. Dynamics Corp.*, 999 F.2d 113, 117 (5th Cir. 1993). The court found that CQ had properly disclosed a calculation of

the advanced stage of the litigation, permitting the new evidence would not have been harmless. *See Hoffman v. Constr. Protective Servs., Inc.*, 541 F.3d 1175, 1179–80 (9th Cir. 2008) ("Later disclosure of damages would have most likely required the court to create a new briefing schedule and perhaps re-open discovery, rather than simply set a trial date. Such modifications to the court's and the parties' schedules supports a finding that the failure to disclose was not harmless."); *NutraSweet Co. v. X-L Eng'g Co.*, 227 F.3d 776, 785–86 (7th Cir. 2000) (finding harm based on scheduling issues). Accordingly, the district court did not abuse its discretion in excluding the evidence pursuant to Rule 37(c).

## IV

For the foregoing reasons, we AFFIRM the judgment of the district court in all respects.

---

damages—the $110,419.17 in CQ's invoice to TXU—on which CQ could proceed to trial.