# IN THE SUPREME COURT OF TEXAS

━━━━━━━━━━

No. 18-0044

━━━━━━━━━━

COPANO ENERGY, LLC, ET AL., PETITIONERS,

v.

STANLEY D. BUJNOCH, LIFE ESTATE, ET AL., RESPONDENTS

━━━━━━━━━━━━━━━━━━━━
ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE THIRTEENTH DISTRICT OF TEXAS
━━━━━━━━━━━━━━━━━━━━

**Argued October 8, 2019**

JUSTICE BLACKLOCK delivered the opinion of the Court.

As happens all the time in modern business, the parties to this contract dispute sent each other many e-mails prior to the anticipated signing of a formal written agreement. Though no formal written agreement was ever executed, the plaintiffs claimed the various e-mails, taken together, amount to an enforceable written contract satisfying the statute of frauds. *See* TEX. BUS. & COM. CODE §§ 26.01–.02 (Texas's primary statute of frauds). They sued for breach of that alleged contract and for tortious interference with it. The defendants argued the statute of frauds bars the claims, and the trial court granted summary judgment for the defendants on all claims. The court of appeals affirmed summary judgment on the tortious interference claim but reversed as to the breach of contract claim. The court of appeals concluded that the e-mails, taken together, satisfy the statute of frauds and amount to a contract enforceable against the defendants.

We disagree. The e-mails containing many of the alleged deal's principal terms are part of a forward-looking request to negotiate a contract. Neither those e-mails nor any other writing evidences the defendant's agreement to the particular terms stated in the e-mails. As a result, there is no "written memorandum which is complete within itself in every material detail," as required by the statute of frauds. *Cohen v. McCutchin*, 565 S.W.2d 230, 232 (Tex. 1978). The court of appeals' judgment on the contract claim is reversed, and judgment is rendered that the plaintiffs take nothing on all their claims.

## I. Background

The plaintiffs[1] (Landowners) individually or collectively own land in Lavaca and Dewitt Counties. In 2011, the Landowners granted easements to Copano,[2] for the construction, operation, and maintenance of a 24-inch pipeline on their properties. The original easement was 30 feet wide, and the pipeline was completed as agreed.

In December 2012, Copano approached the Landowners about obtaining a second easement to construct another 24-inch pipeline on their properties. James Sanford, a landman with Copano, contacted Marcus Schwartz, an attorney representing the Landowners, to discuss the proposed second easement. The record includes a series of e-mails about the proposed easement. The focus of the parties' dispute is whether those e-mails amount to a contract to purchase the proposed easement satisfying the statute of frauds.

---

[1]The Landowners consist of Stanley D. Bujnoch, Life Estate, Betty A. Bujnoch, Life Estate, James J. Bujnoch, Sally Ann Bujnoch, K & HR Properties, L.P., Susan K. McDowell, Allan Grahmann, Shelly E. Summers, Cauley–Barker, Ltd., Jo Ann Schindler, Independent Executrix of the Estate of Annie Mae Technik, Deceased and Trustee of the Annie Mae Technik Family Trust, Sandra Kay Coe, Stanley D. Bujnoch Jr., Transportation Equipment, Inc., Harvey Renger Jr., Trustee of the Harvey Renger Jr. Trust, and Alice Friedrich.

[2]For convenience and consistent with the parties' nomenclature, "Copano" refers to Copano Energy, LLC, Copano Pipelines/South Texas LLC, Copano Pipelines, GP, LLC, Copano Energy Services GP, LLC, CPNO Services, LLC, and Kinder Morgan Energy Partners, L.P.

On December 6, Debbie Bujnoch,[3] who was Schwartz's secretary, e-mailed Sanford and informed him that Schwartz was available for a meeting on December 11 or 13. Sanford responded to Bujnoch by e-mail, suggesting December 11 for the meeting. On December 7, Bujnoch and Sanford exchanged several more e-mails. Bujnoch e-mailed Sanford: "In preparation for the meeting on the 11th, Mr. Schwartz needs to know the size of the NGL line Copano is proposing to put in. He needs [it] for valuation and discussion with our clients." Sanford responded:

> It will be a 24 inch gas line. We will preserve the 2nd line right we purchased for condensate. I will be asking for an additional 20 feet of new right of way. We will be laying the line generally on the North side of the existing 24 inch line (temporary workspace side). I will be asking for an additional 20 feet of temporary workspace. James

Bujnoch responded: "dry gas or liquid?" Sanford responded: "Rich gas." Bujnoch responded: "By that do you mean NGL?" Sanford finally responded:

> When we purchased the original easement for the 24 inch line we purchased the rights for a second 12 inch liquid line. We will be buying an additional 20 foot easement contiguous to the first easement for a 2nd 24 inch gas line. The rights to lay the 12 inch liquid line will be unchanged. James

All of Sanford's e-mails on December 7 use the subject line "Meeting with Schwartz." None of the December 6 and 7 e-mails from Sanford to Bujnoch copied Schwartz. No writing indicates whether the anticipated December 11 meeting took place or, if it did, what Sanford and Schwartz discussed or agreed at the meeting.

On January 30, 2013, Sanford and Schwartz exchanged e-mails for the first time. Sanford wrote to Schwartz and Bill Caraway, another attorney for the Landowners, stating:

> Mark/Bill,

---

[3] While Debbie Bujnoch shares the same surname with some of the Landowners, she was not herself a Landowner.

3

Pursuant to our conversation earlier, Copano agrees to pay your clients $70.00 per foot for the second 24 inch line it proposes to build. In addition to this amount Copano agrees to address and correct the damages to your client's property caused due to the construction of the first 24 inch line.

Please confirm that Copano has access to your client's property for survey and environmental.

Thanks,

James

James Sanford,
Director, Right-of-Way Services
Copano Energy

Schwartz responded to Sanford: "James: In reliance on this representation we accept your offer and will tell our client you are authorized to proceed with the survey on their property. We would appreciate you letting them know a reasonable time before going on their property. mfs/bbc."

On February 1, 5, 6, 11, and 22, six letters were sent to the Landowners, including two letters sent on February 6. The letters were sent by landman Thomas Goolsby, employed by Percheron Field Services and acting on behalf of Copano. Each letter states that Copano is offering to amend the original pipeline easement per an attached amendment and amended plat. The amendments are not included in the record, but an amended "bubble plat" is attached, consisting of a survey of the existing easement and circular images of small sections of the proposed new easement, providing a magnified view of the existing pipeline and the proposed expansion of the existing easement from 30 to 50 feet.[4] The "bubbles" show that the new easement would in some

_____

[4] The court of appeals opinion includes an image of a bubble plat. 581 S.W.3d 262, 267 (Tex. App.–Corpus Christi 2017, pet. granted).

locations fall north of the existing easement and in some locations south of the old easement. The surveys state, "PRELIMINARY (NOT FOR RECORDING)" (emphasis in original). In contrast to the above-described January 30 e-mail from Sanford, which offered the Landowners $70 per foot for the easement, the February letters offer $15 or $25 per foot. None of these offers for the reduced amounts was accepted.

On February 12, 2013, Sanford sent an e-mail to Schwartz concerning one of the Landowners, Transportation Equipment, Inc.[5] The e-mail states: "Copano agrees that it will pay Transportation[,] Inc. $88.00 per foot for the easement for the new 24 inch line. Copano will also pay damages from the first 24 inch line in the total of $73,003.00. Give me a call if you have any questions. Thanks, James." While Sanford offered $88 per foot to Transportation Equipment in this e-mail, Goolsby's February 22 letter to Transportation Equipment offered only $15 per foot. There are no writings indicating that Transportation Equipment accepted either offer.

On February 13, Debbie Bujnoch e-mailed Sanford, copying Caraway: "Please find revisions made to the amendment of row agreement for execution by our clients. If this is satisfactory please let us know and we will have our clients execute the amendments. Debbie Bujnoch, Secretary to Marcus F. Schwartz." This e-mail attached an amendment providing that the parties desired to extend the existing easement by an additional 20 feet to accommodate a second pipeline. The amendment references a new easement "described on Exhibit 'A' and shown and depicted on Exhibit 'B,'" but these attachments are not included in the summary judgment record. The amendment relates to one of the properties subject to the original easement, namely a

---

[5] The parties agree that the reference to "Transportation, Inc." in this email was a reference to Transportation Equipment, Inc.

tract held by Landowners Stanley Bujnoch, Betty A. Bujnoch, Susan K. McDowell, Shelly E. Summers, and Sandra Kay Coe. Sanford responded to this e-mail with an e-mail addressed to Bujnoch and copying Caraway: "I am fine with these changes."

The writings indicate a failure of communication within Copano. In March 2013, Defendant Kinder Morgan was in the process of acquiring Copano, and this transaction may have complicated or confused the easement negotiations. On March 14, 2013, Brent Eubank of Percheron Field Services, on behalf of Copano and purportedly on behalf of Sanford as well, sent an e-mail to Schwartz attaching a "compensation proposal" to the Landowners offering compensation of $20 to $40 per foot under five different scenarios, including scenarios where the new easement would not fully track the existing easement. The e-mail stated,

> Mr. Schwartz,
>
> My name is Brent Eubank and I am sending this landowner compensation proposal on behalf of Copano Pipelines/South, L.P. and James Sanford. Attached you will find a landowner compensation proposal letter. Please review this letter to better understand why we are offering your clients the amount we have. These amounts reflect what Copano is willing to pay for each scenario that we have encountered with the original agreements between Copano and your clients along this pipeline.
>
> Although we realize that Mr. Sanford has had prior contact with you on this matter, in[ ]efforts to keep compensation as fair as possible, we have provided the same letter to all attorneys representing landowners on this project.
>
> Thank you for your time,
>
> Thomas Goolsby
> Project Manager | Percheron Field Services
> . . . .
> Brent Eubank
> Lead Agent | Percheron Field Services

The e-mail copied Thomas Goolsby, James Sanford, and Michael Quinn (another Percheron employee). There are no writings accepting any of these proposals. That same day, Schwartz e-

6

mailed Sanford regarding the Eubank compensation proposals, telling Sanford, "JAMES: THIS IS NOT OUR DEAL[.] WHAT IS GOING ON? PLEASE LET BILL AND ME KNOW." (emphasis in original). Bill Caraway e-mailed Schwartz the same day, with a copy to Sanford, stating: "I say let's get ready to try some condemnation suits." In response, Sanford e-mailed Caraway and Schwartz on March 18, stating,

> I know that this is not our deal. I believe that we have most of the plats. I think that we can start closing easements no later than the end of March (I want to be done by the end of April). Our deal still stands. Copano does not want to go to court with any of your clients. The letter went out to all of the attorneys that represent landowners on the pipeline. I am not sure why Percheron chose to send you and Mark this letter. They know that we already had a deal for your clients. I am sorry for the confusion.
>
> James

The second pipeline was never built. In February 2014, the Landowners sued Copano for breach of contract, alleging a contract to sell an easement to the Landowners for $70 per foot and to Transportation Equipment for $88 per foot. The Landowners sued defendant Kinder Morgan for breach of contract on the theory that Kinder Morgan assumed Copano's contract obligations when it merged with Copano. They also sued Kinder Morgan for tortious interference with contract. The defendants moved for summary judgment, arguing in part that the statute of frauds barred the contract claim. The trial court granted summary judgment and rendered a take-nothing judgment on all claims.

The court of appeals affirmed summary judgment on the tortious interference claim but reversed summary judgment on the breach of contract claim. 581 S.W.3d at 277. Copano petitioned for review on the contract claim, and we granted the petition.

7

## II. Discussion

Certain agreements, including "a contract for the sale of real estate," are "not enforceable unless the promise or agreement, or a memorandum of it" is "in writing" and "signed by the person to be charged with the promise or agreement or by someone legally authorized to sign for him." TEX. BUS. & COM. CODE § 26.01(a), (b)(4). This requirement is commonly called the statute of frauds. Because an easement is an interest in real estate, a contract for the sale of an easement is subject to the statute of frauds. *Pick v. Bartel*, 659 S.W.2d 636, 637 (Tex. 1983). It has long been understood that to satisfy the statute of frauds, "there must be a written memorandum which is complete within itself in every material detail, and which contains all of the essential elements of the agreement, so that the contract can be ascertained from the writings without resorting to oral testimony." *Cohen*, 565 S.W.2d at 232.

The required written memorandum need not always be a single document, however. "[A] court may determine, as a matter of law, that multiple documents comprise a written contract." *City of Houston v. Williams*, 353 S.W.3d 128, 137 (Tex. 2011) (quoting *Fort Worth Indep. Sch. Dist. v. City of Fort Worth*, 22 S.W.3d 831, 840 (Tex. 2000)). Indeed, multiple writings may comprise a contract "even if the parties executed the instruments at different times and the instruments do not expressly refer to each other." *Fort Worth Indep. Sch. Dist.*, 22 S.W.3d at 840. When considering multiple writings proffered as a single contract, it remains the rule that the "essential elements of the agreement" must be evident "from the writings" themselves, "without resorting to oral testimony." *Cohen*, 565 S.W.2d at 232.

The writings described above and relied upon by the Landowners, even when considered together, do not satisfy the statute of frauds. The Landowners claim their contract with Copano

8

arose on January 30, 2013. On that date, Sanford e-mailed Schwartz, "Pursuant to our conversation earlier, Copano agrees to pay your clients $70.00 per foot for the second 24 inch line it proposes to build." Schwartz responded 25 minutes later, "In reliance on this representation we accept your offer . . . ." The January 30 e-mails surely contain an offer and an acceptance. But just as surely, they do not say what is being offered and accepted. Other than the price per foot and the pipeline's size, the January 30 e-mails contain none of the "essential elements of the agreement." *Id.* Sanford's January 30 e-mail indicates that other terms of the deal may have been discussed in "our conversation earlier." But none of the writings tell us anything about that conversation.

The Landowners acknowledge that the January 30 e-mails do not satisfy the statute of frauds on their own. Instead, they claim to find most of the alleged agreement's other essential terms—such as the easement's location and size—in the December 7 e-mails from Sanford to Bujnoch. As the Landowners see it, the easement terms described in Sanford's December 7 e-mails are what was offered and accepted at $70 per foot on January 30. One of Sanford's December 7 e-mails to Bujnoch states, in relevant part:

> It will be a 24 inch gas line. We will preserve the 2nd line right we purchased for condensate. I will be asking for an additional 20 feet of new right of way. We will be laying the line generally on the North side of the existing 24 inch line (temporary workspace side). I will be asking for an additional 20 feet of temporary workspace.

Later the same day, Sanford also wrote to Bujnoch: "We will be buying an additional 20 foot easement contiguous to the first easement for a 2nd 24 inch gas line." These e-mails from Sanford to Bujnoch are the contract terms offered and accepted at $70 per foot on January 30, the Landowners contend.

For two reasons, Sanford's December 7 e-mails do not supply the missing essential terms required to satisfy the statute of frauds. First, the December 7 e-mails themselves reflect no

9

agreement to be bound by the terms they describe. Second, no later writing evidences an agreement to be bound by the terms stated in the December 7 e-mails.

To begin with, Sanford's December 7 e-mails reflect no agreement to be bound by the easement terms they describe. E-mail is a ubiquitous feature of modern life. It is used by nearly everyone for nearly every type of communication, from the flippantly inconsequential to the bindingly formal.[6] When it is alleged that an e-mail amounts to a contract binding on the sender, the e-mail's context must be carefully examined to determine whether it truly evidences the grave intent to be legally bound. Here, neither the context of Sanford's December 7 e-mails nor their verbiage reflects an intent to bind Copano to the easement terms stated in those e-mails.

Considered in their context, the December 7 e-mails are part of Sanford's request that Bujnoch, Schwartz's assistant, arrange a meeting on December 11 at which Sanford and Schwartz would discuss a new easement deal. Sanford is not offering easement terms to Schwartz in the December 7 e-mails. Schwartz himself is not even copied on the December 7 e-mails. Instead, Sanford is describing for Bujnoch, Schwartz's assistant, what Sanford intends to offer to Schwartz at a later in-person meeting Sanford hopes for on December 11. Indeed, Sanford's first December 7 e-mail is in response to Bujnoch's e-mail asking for more information "[i]n preparation for the meeting on the 11th." The entire e-mail thread anticipates a future, in-person meeting at which the terms Sanford's e-mails describe might or might not actually be offered. Viewed in their

---

[6] Copano argued in the court of appeals that Sanford did not "sign" the e-mails as required by the statute of frauds. 581 S.W.3d at 272. The court concluded that because Sanford manually typed his name at the bottom of the e-mails, "at a minimum, a fact issue exists regarding whether [Sanford] evinced an intent to sign the emails." *Id.* The court noted conflict among the courts of appeal on the electronic "signature" necessary for e-mails to satisfy the statute of frauds' requirement that the writing be "signed by the person to be charged with the agreement . . . ." *See id.* at 269; TEX. BUS. & COM. CODE § 26.01(a)(2). Copano has not argued in this Court that Sanford's e-mails were not "signed." We express no opinion on that issue but assume for argument's sake the signature requirement was satisfied because Copano does not contend otherwise.

10

context, the December 7 e-mails are nothing more than a request to negotiate at a later meeting. They describe the terms Sanford anticipates offering at the anticipated meeting, but they do not offer those terms. Such "a writing that contemplates a contract to be made in the future does not satisfy the requirements of the statute of frauds." *Southmark Corp. v. Life Inv'rs, Inc.*, 851 F.2d 763, 767 (5th Cir. 1988) (applying Texas law); *see Hugh Symons Grp., plc v. Motorola, Inc.*, 292 F.3d 466, 470 (5th Cir. 2002) (holding that "an overture to further joint discussion or ongoing negotiations" is not a "binding agreement"); *Columbia/HCA of Houston, Inc. v. Tea Cake French Bakery & Tea Room*, 8 S.W.3d 18, 21 (Tex. App.—Houston [14th] 1999, pet. denied) (holding that a letter constituting the "initial starting point for the negotiations" could not "constitute a binding written agreement").

The future-tense phrasing of the December 7 e-mails further confirms the absence of an agreement to be bound by the terms stated therein. Sanford twice writes that Copano "will be asking for" various terms. He also writes that Copano "will be buying" an additional easement, "will be laying the line generally on the North side," and "[i]t will be a 24 inch gas line." This future-tense language confirms what is already evident from the e-mails' context: Sanford's description of the proposed easement is not a present-tense offer of contract terms. It is a description of the terms he "will be asking for" when he later meets with Schwartz. Courts applying Texas law have confirmed that such writings couched in futuristic language contemplating later negotiations do not satisfy the statute of frauds. *E.g.*, *Hartford Fire Ins. Co. v. C. Springs 300, Ltd.*, 287 S.W.3d 771, 778–79 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) (holding that a writing containing "futuristic" language only contemplating "a contract or promise to be made in the future does not satisfy the requirement of the statute of frauds"); *Martco,*

11

*Inc. v. Doran Chevrolet, Inc.*, 632 S.W.2d 927, 928 (Tex. App.—Dallas 1982, no writ) (observing that "authorities in other jurisdictions uniformly [] disqualify writings which contain 'futuristic' language as not confirmatory of a contract already in existence"); *CQ, Inc. v. TXU Min. Co., L.P.*, 565 F.3d 268, 276 (5th Cir. 2009) (holding that an agreement to "eventually" form an agreement is "contingent language [that] does not satisfy the statute of frauds"); *Micromedia v. Automated Broad. Controls*, 799 F.2d 230, 234 (5th Cir. 1986) (holding that "an offer for an agreement that was not entered into until later" did not satisfy the statute of frauds); *see also Cent. Illinois Light Co. v. Consolidation Coal Co.*, 349 F.3d 488, 489 (7th Cir. 2003) (Posner, J.) ("The negotiations involved the exchange of many documents, but documents that merely evidence negotiations do not satisfy the statute of frauds.").

To satisfy the statute of frauds, it is not enough that the writings state potential contract terms, as Sanford's December 7 e-mails perhaps do. The writings must evidence the "*agreement . . .* so that the *contract* can be ascertained" from the writing. *Cohen*, 565 S.W.2d at 232 (citing *Wilson v. Fisher*, 188 S.W.2d 150, 152 (Tex. 1945)) (emphasis added). Standing alone, the December 7 e-mails fail this standard because they reflect one party's description of terms to be discussed at a future meeting, rather than any party's "agreement" to be bound by a "contract." *Id.* It is well settled, however, that "a court may determine, as a matter of law, that multiple documents comprise a written contract." *City of Houston*, 353 S.W.3d at 137 (quoting *Fort Worth Indep. Sch. Dist.*, 22 S.W.3d at 840). Indeed, multiple writings may amount to a contract "even if the parties executed the instruments at different times and the instruments do not expressly refer to each other . . . ." *Fort Worth Indep. Sch. Dist.*, 22 S.W.3d at 840.

12

Thus, forward-looking writings like the December 7 e-mails could conceivably be used to supply essential terms if *another writing* confirmed that the parties later agreed to the terms stated in the forward-looking writing. The court of appeals looked to Sanford's December 7 e-mails as one part of a multi-document contract and found in them most of the "essential elements of the contract." 581 S.W.3d at 273–75. But a fundamentally "essential element of the contract," without which no contract can exist, is the parties' intent to be legally bound to the contract's terms. *FPL Energy, LLC v. TXU Portfolio Mgmt. Co.*, 426 S.W.3d 59, 63 (Tex. 2014) (quoting *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983) ("Our primary concern in contract interpretation is to 'ascertain the true intentions of the parties as expressed in the instrument.'"). The reason cases applying the statute of frauds generally disfavor forward-looking writings is precisely because such writings usually do not reflect the indispensable element of contract formation—an intent to be bound. *Fischer v. CTMI, L.L.C.*, 479 S.W.3d 231, 237 (Tex. 2016) ("a contract must at least be sufficiently definite to confirm that both parties actually intended to be contractually bound"). The court of appeals erred by failing to require a writing demonstrating not just that the parties agreed to *something*, but that the parties agreed to the terms alleged to be binding on the defendant which in this case are the terms described in the December 7 e-mails. The court of appeals identified one set of writings containing many essential terms (the December 7 e-mails) and another set of writings evidencing an agreement (the January 30 offer and acceptance). It correctly observed that the statute of frauds permits these writings to be "read together" because they "relate to the same transaction." 581 S.W.3d at 271. But it did not require any of the writings to evidence the lynchpin of the Landowners' alleged contract—Copano's agreement to be bound *by the terms stated in the December 7 e-mails*. As explained above, the December 7 e-mails themselves reflect no such

13

intent to be bound by their terms. As explained below, nor does any other writing proffered by the Landowners.

On January 30, 2013, Sanford wrote to Schwartz: "Pursuant to our conversation earlier, Copano agrees to pay your clients $70.00 per foot for the second 24 inch line." Schwartz responded immediately, "In reliance on this representation we accept your offer . . . ." The Landowners attempt to portray these e-mails as an offer and acceptance of the terms described in Sanford's December 7 e-mails. Nothing in the January 30 e-mails, however, reflects an agreement to the terms described in the December 7 e-mails. To the contrary, Sanford offered $70 per foot to Schwartz's clients "[p]ursuant to our conversation earlier." He did not offer $70 per foot "pursuant to my December 7 e-mails." The writings reflect nothing about "our conversation earlier." They do not tell us whether the planned December 11 meeting took place or whether any other meetings or conversations occurred. The January 30 e-mails suggest there was a "conversation earlier," but no writing indicates what was discussed in that conversation or what easement terms Sanford had in mind when he used the words, "Pursuant to our conversation earlier." There is simply no way of knowing from the writings whether the parties agreed in "our conversation earlier"—and therefore in the January 30 e-mails—to the easement terms described in the December 7 e-mails.

To satisfy the statute of frauds, the writing or writings "must contain the essential terms of a contract, expressed with such certainty and clarity that it may be understood *without recourse to parol evidence to show the intention of the parties*." *Wilson*, 188 S.W.2d at 152 (emphasis added). Tellingly, the Landowners point for support to Schwartz's affidavit, in which he states that Sanford offered the alleged easement terms both through e-mail and at an in-person conversation. The

14

need for witness testimony to explain that "our conversation earlier" recapitulated the easement terms contained in December 7 e-mails demonstrates that the proffered writings do not "contain the essential terms of the contract . . . without recourse to parol evidence to show the intention of the parties." *Id*. The December 7 and January 30 e-mails do not show with certainty and clarity that the acceptance of the $70 price on January 30 also included acceptance of the terms described in the December 7 e-mails.

Other, later writings proffered by the Landowners do not rescue their claims from the statute of frauds' bar. If anything, these documents further confirm that the alleged agreement was never reached. The February 2013 letters from Goolsby to the Landowners appear to reject the earlier negotiations by Sanford and make a new offer at a much lower price. This new offer was not accepted by any Landowner. The February 12, 2013 e-mail from Sanford offering $88 per foot to Transportation Equipment, Inc. was sent after Goolsby had earlier offered $15 per foot to this Landowner. There is no writing stating that either of these offers was accepted. The February 13 e-mail from Debby Bujnoch to Sanford attaching an amended easement applies only to one property and was sent after Goolsby notified the owners of this property and other Landowners that Copano had substantially reduced its earlier offer of $70 per foot. The February offer letters included a "bubble plat," a sketch of where the proposed easement would lie relative to the existing easement. The court of appeals relied on this document, in part, to indicate the location of the easement. 581 S.W.3d at 267. The bubble plat was attached to a letter offering a different deal at a substantially lower price, however. Neither the bubble plat nor the letter to which it was attached indicates that the bubble plat shows the easement that Sanford offered and Schwartz accepted for $70 per foot on January 30. Finally, Sanford's March 18 e-mail to Schwartz that "[o]ur deal still

15

stands" only re-raises the question—unanswered by any of the writings—of what exactly the "deal" was. On top of that, Goolsby's February offer letters indicate that Copano had withdrawn the $70-per-foot offer by the time Sanford represented that "[o]ur deal still stands." None of the later writings make the essential showing that Copano ever agreed to the easement terms described in forward-looking language in the December 7 e-mails.

### III. Conclusion and Disposition

There is no way for a court, on this record, to piece together with certainty and clarity a collection of writings showing the essential terms of an easement contract and the parties' agreement to be bound by those terms. As a result, under the statute of frauds, the Landowners' proffered contract "is not enforceable," TEX. BUS. & COM. CODE § 26.01(a), and Copano cannot be liable for breach of it. The trial court's summary judgment for Copano on the breach of contract claim was proper.

The judgment of the court of appeals is reversed as to the breach of contract claim. A take-nothing judgment is rendered on all claims.

_____
James D. Blacklock
Justice

**OPINION DELIVERED:** January 31, 2020

16