COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| ROBERT F. DUNCAN, JR. and INTERAMERICA PROPERTY COMPANY, | § | |
| | § | |
| Appellants, | § | No. 08-06-00007-CV |
| v. | § | Appeal from the |
| | § | 171st Judicial District Court |
| F-STAR MANAGEMENT, L.L.C., F-STAR PROPERTIES, INC., F-STAR SOCORRO, L.P., FIVE STAR INTERNATIONAL HOLDINGS INCORPORATED, NINE STAR INVESTMENTS INCORPORATED, GERALD C. "JERRY" AYOUB, FIVE ON SITE INTERNATIONAL, INC. and PENTA ESTRELLA S. de R.L. de C.V., | § | of El Paso County, Texas |
| | § | (TC# 99-750) |
| | § | |
| | § | |
| | § | |
| | § | |
| Appellees. | § | |

**O P I N I O N**

Appellant Robert Duncan sued Appellees F-Star[1] for unpaid commission and tax-consulting fees. The trial court directed a verdict in favor of F-Star, and Mr. Duncan appeals that judgment. We find that the commission agreements between Mr. Duncan and F-Star are unenforceable under the Real Estate License Act, and that Mr. Duncan is barred from collecting tax-consulting fees because he was not a registered property-tax consultant, and we affirm the trial court's judgment.

Robert Duncan is a licensed real estate broker. He is the sole owner of InterAmerica Property Company, an El Paso brokerage dealing in commercial real estate along the United

---

[1] We will refer to Appellees collectively as "F-Star" throughout this opinion.

States - Mexico border. In 1997, Thomson Consumer Electronics wanted to consolidate its warehouse facilities in El Paso. Thomson wanted to find warehouse space with railroad access, close proximity to the border, foreign-trade zoning, and the possibility of property-tax abatements. Thomson entered an exclusive-representation agreement with Mr. Duncan to find an appropriate space. The agreement specified that Mr. Duncan should negotiate his commission with the landlord of the property. Several developers competed to provide Thomson with the warehouse space, including Five Star International, one of the companies owned by Appellee Gerald Ayoub.

After Mr. Ayoub learned about Thomson's proposed warehouse project, he asked InterAmerica to find railroad-accessible property in Socorro, which Mr. Ayoub could purchase and lease to Thomson. Mr. Duncan found a suitable piece of farmland. Nine Star Investments, another of Mr. Ayoub's companies, agreed to purchase the farmland from Wells Fargo Bank on October 29, 1997. The terms of the purchase were laid out in an earnest-money contract signed by Mr. Ayoub, Mr. Duncan, and a real-estate-asset manager from Wells Fargo. The earnest-money contract identified the land as "consisting of Tracts 15, 16 and 17, in Block 11, out of the Socorro Grant, El Paso County, Texas, consisting of not more than 145 acres." The earnest-money contract also specified that "Buyer shall pay Broker a fee as specified in a separate agreement between Broker and Buyer," with "Buyer" referring to Nine Star International and "Broker" referring to InterAmerica.

On November 15, 1997, Mr. Duncan sent Mr. Ayoub a letter stating that InterAmerica had procured Five Star Development, yet another of Mr. Ayoub's companies, as a prospective buyer for property identified only as "Operation Campus View, Socorro, Texas." The letter stated that InterAmerica would receive a 6 percent commission if Five Star Development

purchased the property. The letter also stated that the agreement would begin on November 15, 1997 and last for one year. Both Mr. Duncan and Mr. Ayoub signed the letter.

Thomson's corporate real estate officer determined that Mr. Ayoub's newly acquired property in Socorro would be the ideal site for Thomson's warehouse. On November 26, 1997, Mr. Duncan sent Mr. Ayoub another letter stating that InterAmerica had procured Thomson as a prospective tenant for the property in Socorro. The property was again identified only as "Operation Campus View, Socorro, Texas." The letter stipulated that InterAmerica would receive a commission of 1.4 percent of the total rent for the entire term.

On December 11, 1997, Thomson entered a lease with Mr. Ayoub's company Five Star International as landlord. Under the terms of the lease, Thomson would rent a 950,000 square foot building to be constructed by Five Star International. The building would be located on a 67 acre parcel of land, which the lease identified with addresses and a map. The legal description of the land was "a portion of Tracts 15-17, inclusive Block 11, Socorro Grant, El Paso County, Texas." The lease term was for twelve years.

After signing the lease with Thomson, Mr. Ayoub sought tax abatements on his newly purchased 145 acre tract in Socorro, including the 67 acres rented by Thomson. Mr. Duncan attended several meetings with taxing authorities on Mr. Ayoub's behalf, and he delivered a presentation to the Socorro Independent School District. The presentation was successful--on March 9, 1998, Mr. Ayoub's company F-Star Socorro entered a ten-year tax-abatement agreement with the school district.

Meanwhile, development of the property hit several snags. The land-sale closing was delayed three times, finally occurring on March 24, 1998. Mr. Ayoub also had difficulty obtaining a loan. In order to procure the loan, Mr. Ayoub asked Mr. Duncan to defer his

commission until 1999.  Mr. Duncan agreed to defer his commission, but he requested advances from Mr. Ayoub to keep his company afloat.  In February 1998, Mr. Duncan received checks for $50,000 and $24,500 from Mr. Ayoub's company Five On-Site International.  In April, Mr. Duncan received two more checks, for $25,500 and $20,000, also from Five On-Site International.  As part of his agreement to defer his commission, Mr. Duncan requested that his commission on the lease be raised from 1.4 percent to 5 percent.  On May 1, 1998, Mr. Duncan sent Mr. Ayoub a letter stating that InterAmerica would receive a commission of 5 percent of the total rent for the entire term of the lease.  The letter also specified that F-Star Socorro would pay Mr. Duncan a consulting fee of $500,000 for his services in connection with the tax-abatement program.  Both Mr. Duncan and Mr. Ayoub signed the letter.

Thomson occupied the Socorro warehouse site on July 1, 1998.  Mr. Duncan and InterAmerica did not directly receive any further payments on the commission, although Mr. Ayoub testified that his companies paid third parties on Mr. Duncan's behalf.

On January 18, 2001, Mr. Duncan filed his third amended petition against Appellees Mr. Ayoub, F-Star Management, F-Star Properties, F-Star Socorro, Five Star International, Nine Star Investments, Five On-Site International, and Penta Estrella.  In the petition, Mr. Duncan alleged that F-Star owed him more than $3 million in unpaid commissions and $500,000 in tax-consulting fees.  Mr. Duncan alleged breach of contract, quantum meruit, fraud, breach of fiduciary duty, and deceptive trade practices.  After a jury trial, the trial judge issued a directed verdict, ordering that Mr. Duncan take-nothing on his claims.

A directed verdict is proper when (1) the opponent's pleadings are defective and insufficient to support a judgment, (2) the evidence conclusively proves a fact that establishes the movant's right to judgment as a matter of law, or negates the right of the nonmovant to judgment,

or (3) the evidence offered is insufficient to raise a fact issue on the cause of action at issue. *State ex rel. Tex. Dep't of Transp. v. Esquivel*, 92 S.W.3d 17, 19 (Tex.App.--El Paso 2002, no pet.). In reviewing a trial court's grant of a directed verdict on an evidentiary basis, we determine whether there is any evidence of probative force to raise fact issues on the material issues presented. *Id.* at 19-20. We consider all of the evidence in a light most favorable to the party against whom the verdict was instructed and disregard all contrary evidence. *White v. Sw. Bell Tel. Co., Inc.*, 651 S.W.2d 260, 262 (Tex. 1983). If there is any conflicting evidence of probative force on any theory of recovery, the issue is for a jury. *Id*. In that case, a directed verdict is improper, and the case must be reversed and remanded for the jury's determination on the issue. *Esquivel*, 92 S.W.3d at 20.

In Issue One, Mr. Duncan argues that there was sufficient evidence to support his claim for commission from the lease between Thomson and Five Star International, and that the directed verdict was improperly granted on that claim.

At the time that Mr. Duncan filed his petitions in the trial court, the Real Estate License Act provided: "An action may not be brought in a court in this state for the recovery of a commission for the sale or purchase of real estate unless the promise or agreement on which the action is brought, or some memorandum thereof, is in writing and signed by the party to be charged or signed by a person lawfully authorized by the party to sign it." Act of 1997, 75th Leg., R.S., ch. 839, § 27(b), 1977 Tex.Gen.Laws 2695, 2709 (amended 2001)(current version at Tex.Occ.Code Ann. § 1101.806(c)(Vernon 2004)). "Real estate" under the Act includes a leasehold. *Tex. Builders v. Keller*, 928 S.W.2d 479, 481 (Tex. 1996).

To comply with the Act's requirements, a written commission agreement must provide a description of the real estate that would satisfy the statute of frauds. *Keller*, 928 S.W.2d at 481.

In other words, the agreement must furnish, either within itself or by reference to some other existing document, the means or data by which the real estate may be identified. *Id.*, *citing Owen v. Hendricks*, 433 S.W.2d 164, 166 (Tex. 1968). A commission agreement does not have to contain a metes-and-bounds property description to be enforceable, but it must furnish the data to identify the property with reasonable certainty. *Id.*, *citing Morrow v. Shotwell*, 477 S.W. 2d 538, 539 (Tex. 1972). Parol evidence may be used to clarify or explain the agreement, but not to supply the agreement's essential terms. *Id.* For example, a court of appeals held that a contract for the sale of "my ranch of 2200 acres" satisfied the statute of frauds where extrinsic evidence showed that the grantor owned one ranch, which contained 2200 acres. *Jones v. Smith*, 231 S.W.2d 1003, 1004 (Tex.Civ.App.--Austin 1950, writ ref'd n.r.e.). However, a commission agreement for the sale or lease of an unidentified portion of a larger, identifiable tract is not sufficient. *See Keller*, 928 S.W.2d at 482 (holding unenforceable a commission agreement that specified the address of the leased property, but did not identify which 58,333 square feet of the property's total 100,000 square feet were being leased).

Mr. Duncan argues that the May 1 letter expresses his final agreement with Mr. Ayoub for a 5 percent commission on the lease to Thomson. The May 1 letter only identifies the property as "Build-to-Suit for Thomson Consumer Electronics Facility in Socorro, Texas ("Property")." Mr. Duncan does not argue that this is a sufficient description of the property. Rather, he argues that the May 1 letter should be read together with the December 11 lease, which specifies the size and location of the leased property.

But even assuming that the December 11 lease contains a sufficient description to identify the property, the May 1 letter does not explicitly refer to the December 11 lease. The first three paragraphs of the letter state as follows:

The purpose of this letter is to confirm that InterAmerica Property Company, as Broker, has procured Thomson Consumer Electronics ("Tenant"), as a prospective tenant for the Property. In the event a lease of the Property, or any part thereof, is consummated with Tenant, you agree to pay InterAmerica Property Company its commission as described below.

(1)    For a net lease (where the Tenant pays all or a major portion of the cost of maintaining and operating the Property), an amount equal to five percent (5 %) of the total rent for the entire term, shall be paid by you to InterAmerica Property Company upon occupancy of the Property.

(2)    The lease contains options to lease additional space in the Property. If such option is exercised, or if additional space is leased through subsequent modification of the lease or its terms, an additional commission computed as $2.58 of the $5.50 psf construction management fee outlined in Paragraph 10(b) of the lease is earned and payable with respect to such additional space per Paragraph 10(b).

The prefatory paragraph and paragraph (1) appear to contemplate a lease to be signed at a future date. Although paragraph (2) refers to "the lease," it refers to a lease with a paragraph 10(b), regarding an option to expand. The December 11 lease has no paragraph 10(b). As far as we are able to determine, the only document in the record here with a paragraph 10(b) on expansion is an unsigned land-sale contract between F-Star Socorro and a third-party family trust.

We find that the May 1 letter is not an enforceable commission agreement because it does not sufficiently identify the leased property and does not specifically refer to another existing document that does identify the property. Accordingly, Issue One is overruled.

In Issue Two, Mr. Duncan argues that there was sufficient evidence to support his claim for commission from the land-sale contract between Wells Fargo and Nine Star Investments.

In support of this argument, Mr. Duncan relies on the November 15 letter, which stipulated that InterAmerica would receive a 6 percent commission on the sale of land identified

only as "Operation Campus View, Socorro, Texas ("Property")." Mr. Duncan argues that the parties understood the phrase "Operation Campus View" to refer to a specific site in Socorro where the Thomson facility would eventually be located. He also argues that the November 15 letter should be read together with the earnest-money contract, in which Nine Star agreed to purchase the 145 acre tract from Wells Fargo.

The record does not reflect that the phrase "Operation Campus View" was used unambiguously to refer to a single tract of land. Thomson used the phrase "Operation Campus View" to refer generally to its project of consolidating its warehouse facilities. The phrase appears in both the November 15 letter, describing the 145 acre tract that was sold to Nine Star, and the November 26 letter, describing the smaller 67 acre tract that was leased to Thomson. By itself, the term could not have connoted a specific tract of land with a specific acreage.

Moreover, the November 15 letter does not refer to the earnest-money contract or to any other land-sale contract. The only mention of an agreement between Five Star Development and Wells Fargo appears to be a contemplation of a future agreement: "In the event a sale of the Property or any part thereof is consummated with Buyer then you agree to pay IPC its commission as described below . . . ."

The November 15 letter is not an enforceable commission agreement because it does not sufficiently identify the sold property and does not specifically refer to another existing document that does identify the property. Accordingly, Issue Two is overruled.

In Issue Three, Mr. Duncan argues that there was sufficient evidence to support his claim for tax-abatement consulting fees. F-Star responds by arguing that because neither Mr. Duncan nor InterAmerica is a registered property-tax consultant, they may not recover consultant fees under Section 1152.151(a) of the Occupations Code. Mr. Duncan did not respond to this

argument in his reply brief. At oral argument, Mr. Duncan's counsel admitted that there was nothing in the record to show Mr. Duncan was a registered property-tax consultant, but argued that because the agreement concerned rural property, Mr. Duncan was not required to register.

In 1999, when Mr. Duncan claims to have performed tax-consulting services for Mr. Ayoub's companies, the Public Accountancy Act provided: "A person may not represent that an individual is a registered property tax consultant, agent, advisor, or representative unless the individual is a registered property tax consultant or registered senior property tax consultant." Act of 1995, 74th Leg., R.S., ch. 727, § 2(c), 1995 TEX.GEN.LAWS 3833 (amended 2001)(current version at TEX.OCC.CODE ANN. § 1152.151 (Vernon 2004)). But a consultant could be exempt from that section if he provided consulting services only for a single-family residence. Act of 1995, 74th Leg., R.S., ch. 727, § 2(d)(8), 1995 TEX.GEN.LAWS 3833 (amended 2001)(current version at TEX.OCC.CODE ANN. § 1152.002(a)(8)(Vernon 2004)). On June 1, 2003, the registration requirement was repealed and recodified at Section 1152.151 of the Occupations Code, while the single-family-residence exception was recodified at Section 1152.002(a)(8). On June 20, 2003, the single-family-residence exception was amended to provide that a consultant could be exempt from the registration requirement if he provided consulting services only for farms, ranches, or single-family residences. TEX.OCC.CODE ANN. § 1152.002(a)(8).

The rural exception to the property-tax-consultant registration requirement was not in effect in 1999, when Mr. Duncan allegedly performed his tax-consulting services for Mr. Ayoub's companies. Therefore, Mr. Duncan's claim for property-tax-consulting fees is barred, as there is no evidence indicating that he was properly registered under the Public Accountancy Act. Issue Three is overruled.

In Issue Four, Mr. Duncan makes two arguments: (1) that Mr. Ayoub judicially admitted

that he owed Mr. Duncan a commission for the lease; and (2) that Mr. Ayoub partially performed by paying Mr. Duncan $120,000 in advances on the commission.

A party's testimonial declarations that are contrary to his position are considered "quasi-admissions." *Mendoza v. Fidelity & Guar. Ins. Underwriters, Inc.*, 606 S.W.2d 692, 694 (Tex. 1980). Quasi-admissions are distinct from true judicial admissions, which are formal waivers of proof usually found in pleadings or the stipulations of the parties. *Id.* A quasi-admission will be treated as a judicial admission only if: (1) the declaration was made during the course of a judicial proceeding; (2) the statement is contrary to an essential fact embraced in the declarant's theory of recovery or defense; (3) the statement is deliberate, clear, and unequivocal; (4) giving conclusive effect to the declaration will be consistent with public policy; and (5) the statement is not destructive of the opposing party's theory of recovery. *Mendoza*, 606 S.W.2d at 694. A judicial admission is waived when evidence contrary to the purported admission is heard without objection on that ground. *Field v. AIM Mgmt. Group, Inc.*, 845 S.W.2d 469, 473 (Tex.App.--Houston [14th Dist.] 1993, no writ); *Indus. Disposal Supply Co., Inc. v. Perryman Bros. Trash Serv.*, 664 S.W.2d 756, 764 (Tex.App.--San Antonio 1983, writ ref'd n.r.e.).

Mr. Duncan points to Mr. Ayoub's deposition testimony, in which Mr. Ayoub stated: "If you're asking if he was entitled to 1.4 percent or Inter America was entitled to 1.4 percent commission stated in the commission agreement of approximately $434 [thousand], yes, we go -- I've always agreed to that." But at trial, when Mr. Ayoub was asked why he used Five On-Site International to pay Mr. Duncan rather than one of the business entities involved in the Socorro transaction, Mr. Ayoub responded: "They were advances. And none of those companies you mentioned owed him any money." Mr. Duncan's counsel did not object to this remark. The latter statement made at trial plainly contradicts Mr. Ayoub's earlier deposition testimony. By

not objecting, Mr. Duncan waived his judicial-admission contention. *See Field*, 845 S.W.2d at 473.

Mr. Duncan also argues that Mr. Ayoub and his companies partially performed on the agreement by paying Mr. Duncan $120,000 in advances. Partial performance of an otherwise-unenforceable agreement will sometimes relieve the performing party from the statute of frauds, but the partial performance must be unequivocally referable to the agreement and corroborative of the fact that an agreement was made. *Leon Ltd. v. Albuquerque Commons P'ship*, 862 S.W.2d 693, 702 (Tex.App.--El Paso 1993, no writ). What is done must itself supply the key to what is promised. *Chevalier v. Lane's, Inc.*, 147 Tex. 106, 113, 213 S.W.2d 530, 534 (Tex. 1948).

The checks from Five On-Site International to Mr. Duncan do not unequivocally corroborate any of the unenforceable commission agreements involved in this case. Both commission agreements specify that commission should be paid to InterAmerica, but the checks are made out to Mr. Duncan individually. The checks are from Five On-Site International, which was not a party to either commission agreement. Moreover, the memo sections of the checks also do not indicate that they are commission payments. One check states that it is for a "Consulting Fee," another states that it is to "Reimburse Expenses," and the other two have blank memo sections. Neither the sender nor the recipient of the checks was a party to the commission agreements, and the memo sections do not suggest that the checks were commission payments. The checks do not corroborate the commission agreements sufficiently to constitute partial performance and circumvent the statute of frauds. Issue Four is overruled.

In Issues Five and Six, Mr. Duncan argues that there was sufficient evidence to establish a fact question as to whether Mr. Ayoub had engaged in fraud through his alter ego companies.

In Mr. Duncan's third amended petition, he did not allege any fraud damages apart from

his lost commissions and his lost tax-consulting fee.  As discussed above, we find that Mr. Duncan's commission agreement and his tax-consulting agreement are both unenforceable. A real-estate broker may not allege fraud to recover commission on an unenforceable commission agreement, even if he can prove the elements of fraud.  *Keller*, 928 S.W.2d at 482; *see also Trammell Crow Co. No. 60 v. Harkinson*, 944 S.W.2d 631, 633 (Tex. 1997)(barring a broker's claims for tortious interference and civil conspiracy where there was no enforceable commission agreement and the broker only sought the commission as damages).

Because Mr. Duncan did not allege damages apart from his lost commissions and lost tax-consulting fees, both of which arise from unenforceable agreements, we find that his action for fraud is barred.  Issues Five and Six are overruled.

We affirm the trial court's judgment.


August 21, 2008

DAVID WELLINGTON CHEW, Chief Justice

Before Chew, C.J., McClure, ad Carr, JJ.