**Affirmed in Part, Reversed in Part, and Remanded, and Opinion and Dissenting Opinion filed June 28, 2013.**



In The

# Fourteenth Court of Appeals

### NO. 14-11-00058-CV
### NO. 14-11-00229-CV

**GORDON WESTERGREN, Appellant/Cross-Appellee**

**V.**

**NATIONAL PROPERTY HOLDINGS, L.P., MICHAEL PLANK, AND RUSSELL PLANK, Appellees/Cross-Appellants**

**On Appeal from the 269th District Court
Harris County, Texas
Trial Court Cause No. 2008-36847**

## DISSENTING OPINION

Appellant Gordon Westergren signed a contract without reading it. The contract—a release—was a short document but an important one. By its terms, the two-page agreement was meant to resolve a high-dollar business dispute between sophisticated parties. A lot of money was at stake. But, Westergren was in a

hurry. He did not have his reading glasses, and he chose not to get them. He had his magnifier, but he chose not to use it. He had the option of having the document read aloud, but he chose not to take it. Westergren's choice was to sign the document without reading it or having it read to him.

Litigation often follows on the heels of bad choices. And, bad choices sometimes follow on the heels of litigation.

Today, the majority chooses not to apply longstanding Texas law that says people are bound by the plain words in the contracts they sign. The majority instead chooses to craft a fraudulent-nondisclosure theory under which one who chooses not to use his vision enhancers when signing a contract is not bound by the document's plain words. The majority's choice goes against the strong current of accountability that runs through Texas law. And, it also goes against binding precedent of the Supreme Court of Texas.

In choosing a partial-performance analysis to determine if an exception to the statute of frauds applies, the majority goes against the weight of Texas authority and creates a conflict with sister courts of appeals. The First Court of Appeals, among others, has held that no fact issue exists despite some evidence that conduct alleged to be partial performance could have been carried out for the fulfillment of the oral agreement. The majority forges a different path and reaches a different destination, an unfamiliar place where the majority applies the partial-performance exception to the statute of frauds even though the alleged conduct was not unequivocally referable to partial performance of the alleged oral agreement.

The issue at the center of today's controversy is best answered by concluding that the trial court did not err in disregarding the jury's breach-of-contract findings and in rendering judgment that Westergren take nothing as to his

breach-of-contract claim. This court should affirm the trial court's judgment in favor of appellees National Property Holdings, L.P., Michael Plank, and Russell Plank (collectively, the "Plank Parties"). Because it does not, I respectfully dissent.

## I. The trial court did not err in disregarding the jury findings regarding the breach-of-contract claim.

In his first issue, Westergren asserts that the trial court erred in rendering judgment notwithstanding the verdict as to his breach-of-contract claim and in granting the Plank Parties' motion to disregard jury findings regarding this claim.[1] In support of this issue, Westergren asserts that the trial court was wrong to disregard the jury's finding in response to Question 3 that Russell partially performed his oral agreement with Westergren. The jury found that Russell agreed to pay Westergren $1 million and a 5% profit interest in the development of the property in question (the "Agreement"). In response to Question 3, the jury found that Russell partially performed the Agreement. Under the trial court's charge, as part of this finding, the jury found that Russell's actions or conduct unequivocally refer to the Agreement, corroborate the existence of the Agreement, and were carried out with no other design than to fulfill the Agreement. Westergren asserts that the payment of $500,000 to him in June 2006 was an act that could have been done for no other reason than to satisfy Russell's agreement to pay him $1 million and a 5% profit interest in the development of the property in question

---

[1] In this motion, the Plank Parties asked the trial court to disregard the jury's findings regarding the breach-of-contract claim based upon various grounds. The trial court granted the Plank Parties' motion to disregard the jury findings regarding the breach-of-contract claim, without specifying the grounds upon which it relied. Therefore, on appeal, Westergren must show that each independent ground asserted against the breach-of-contract claim does not provide a basis for affirming the trial court's judgment as to this claim. *See Fort Bend County Drainage Dist. v. Sbrusch*, 818 S.W.2d 392, 394 (Tex. 1991). The Plank Parties assert that, in his appellate briefing, Westergren has not mentioned or attacked the sixth ground they asserted in the motion against the breach-of-contract claim. In this opinion, it is presumed for the sake of argument that Westergren challenged each independent ground in his appellate briefing.

("Property").[2] But, the uncontroverted evidence at trial showed that this payment came from the bank account of National Property Holdings, L.P. ("National Property") and that Russell has no ownership interest in that entity.[3] Even if this payment were considered an act of Russell, this act would not be solely referable to partial performance of the Agreement.

As shown by evidence at trial, the act of paying Westergren $500,000 also could have been done to compensate Westergren for services he had provided in connection with the Property, with an accompanying release by Westergren of claims against various persons, including National Property and Michael and arguably Russell.[4] Moreover, under the unambiguous language of the two-page "Agreement and Release" Westergren signed on June 30, 2006 ("Release Agreement"), Westergren received the $500,000 as consideration for his releasing various claims and interests, including (1) any right, title, or interest in or to the Property, (2) any right, title, or interest in or to any entity owning or holding title to the Property, including National Property, (3) any income, rents, profits, or other proceeds relating to or derived from the Property, and (4) all claims against National Property, Michael, and their respective agents and employees arising out of or pertaining in any way to the Property. For Russell's tender of the National Property check to Westergren to constitute partial performance of the Agreement, the nature of this act must be such that it could have been done for no other reason

---

[2] The evidence at trial does not reflect any other action or conduct that arguably could have constituted partial performance of the Agreement.

[3] *See Duncan v. F-Star Management, L.L.C.*, 281 S.W.3d 474, 481 (Tex. App.—El Paso 2008, pet. denied) (concluding there was no fact issue as to whether checks showed partial performance in part based on fact that check was drawn on account of entity that was not party to the agreement sought to be enforced despite non-compliance with statute of frauds).

[4] Under the unambiguous language of the Agreement and Release, Westergren released claims against National Property and Michael. Though he was not specifically named in the Release, Russell asserts that the Release also covers claims against him.

than to fulfill the Agreement.[5]  That conclusion cannot reasonably be drawn from the evidence in our record.

Under the unambiguous terms of the Release Agreement, the $500,000 payment could have been made to obtain the releases contained in the Release Agreement, which are incompatible with fulfillment of the Agreement.  Under the familiar legal-sufficiency standard of review, the evidence is legally insufficient to support a jury finding that this payment unequivocally referred to the Agreement, corroborated its existence, and was done with no other design than to fulfill the Agreement.[6]  Thus, the evidence is legally insufficient to support the jury's finding in response to Question 3, and the trial court did not err in disregarding the breach-of-contract findings and in rendering judgment that Westergren take nothing as to his breach-of-contract claim.  Accordingly, this court should overrule Westergren's

[5] *See Resendez v. Maloney,* No. 01-08-00954-CV, 2010 WL 5395674, at *7 (Tex. App.—Houston [1st Dist.] Dec. 30, 2010, pet. denied) (mem. op.); *Campbell v. Northwestern Resources Co.*, No. 10-08-00283-CV, 2009 WL 3646085, at *2 (Tex. App.—Waco Nov. 4, 2009, no pet.) (mem. op.); *Barnett v. Legacy Bank of Texas*, No. 11-02-00114-CV, 2003 WL 22358578, at *7 (Tex. App.—Eastland Oct. 16, 2003, pet. denied) (mem. op.); *Exxon Corp. v. Breezevale Ltd.*, 82 S.W.3d 429, 439–40 (Tex. App.—Dallas 2002, pet. denied); *CQ, Inc. v. TXU Mining Co.*, 565 F.3d 268, 276–77 (5th Cir. 2009) (applying Texas law).

[6] *See Resendez,* 2010 WL 5395674, at *7 (holding there was no genuine fact issue as to partial performance because the joint promotion of 23 events by Resendez and two companies was not solely referable to the alleged agreement, given that the promotion could have been done under another contractual arrangement); *Duncan*, 281 S.W.3d at 481–82 (concluding there was no fact issue as to whether checks showed partial performance of alleged commission agreement when there was evidence that the checks could have been for consulting services or for reimbursement of expenses rather than for payment of commissions); *Barnett*, 2003 WL 22358578, at *7 (holding there was no fact issue regarding partial performance of alleged agreement because claimant's performance of construction could be referable to his obligations under a different contract with a third party); *Breezevale Ltd.*, 82 S.W.3d at 439–40 (holding evidence was legally insufficient to support jury's finding of partial performance of alleged agreement because the conduct in question could have been related to services performed under another contract); *Rodriguez v. Klein*, 960 S.W.2d 179, 186 (Tex. App.—Corpus Christi 1997, no pet.) (holding there was no fact issue regarding partial performance of alleged agreement because claimant's performance could be referable to performance of other contracts);  *CQ, Inc.*, 565 F.3d at 276–77 (applying Texas law and holding there was no fact issue regarding partial performance of alleged agreement because company's work could be referable to performance of other contract).

first issue.

**A. The majority's low threshold for raising a fact issue as to whether conduct is "unequivocally referable" to the Agreement creates a conflict with sister courts of appeals.**

Under the majority's analysis, because there was some testimony indicating that Russell's tender of the $500,000 check represented a partial payment of the amounts due under the Agreement, there is a fact issue regarding whether this conduct constituted partial performance.[7] Under this approach, if a plaintiff testifies that certain conduct was partial performance of an oral agreement subject to the statute of frauds and other evidence shows that this conduct could have been done for a reason other than to fulfill the oral agreement, then there is a fact issue, and the jury decides whether this exception to the statute of fraud applies.[8] But, this analysis contradicts cases from sister courts of appeals—including the First Court of Appeals—in which courts have held that no fact issue exists despite such conflicting evidence.[9]

---

[7] *See ante* at pp. 30–32.

[8] *See id.*

[9] *See Resendez,* 2010 WL 5395674, at *7 (holding there was no fact issue as to partial performance despite plaintiff's testimony that plaintiff and two companies jointly promoted 23 events pursuant to alleged partnership agreement, because these promotions could have been done under another contractual arrangement); *Barnett*, 2003 WL 22358578, at *7 (holding there was no fact issue regarding partial performance of alleged agreement despite claimant's assertion that he continued working on project based upon bank's alleged promise to loan additional funds, because claimant's performance of construction could be referable to his obligations under a different contract with a third party); *Breezevale Ltd.*, 82 S.W.3d at 439–40 (holding evidence was legally insufficient to support jury's finding of partial performance of alleged agreement because the conduct in question could have been related to services performed under other contract).

6

***B. The evidence is legally insufficient to show that Russell fraudulently induced Westergren to enter into the Release Agreement by fraudulent misrepresentations or by any alleged fraudulent failure to disclose that the Release Agreement contains releases by Westergren.***

The majority does not address the effect of the unambiguous terms of the Release Agreement on the partial-performance analysis because the majority holds the evidence is legally sufficient to support a jury finding that Russell fraudulently induced Westergren to enter into the Release Agreement.[10] Westergren met with Russell on June 30, 2006, at which time Russell gave Westergren the check for $500,000, and Westergren signed the two-page Release Agreement, which was notarized in Westergren's presence. The document's title—"**AGREEMENT AND RELEASE**"— is in extra-large, all-capital, bold letters, underlined. The specific release language in the body of the document is likewise in bold, all-capital letters. The fourth and final paragraph of the document contains a single sentence: "**THIS RELEASE IS EXECUTED AND DELIVERED** effective 30[th] [] day of June, 2006." The conspicuous, bolded, all-capital letters are just millimeters from Westergren's signature.

Westergren testified at trial that he did not have his reading glasses with him, but admitted that he did have a magnifying glass and that the purpose of this vision enhancer was to help with reading. Westergren gave the following testimony regarding the conduct that Westergren asserts fraudulently induced him to sign the Release Agreement:

Just kind of waiting around and finally Russ calls and Traci took me

---

[10] The majority concludes that the jury made such a finding in response to Question 14, which submitted a fraudulent nondisclosure theory without any reference to the Release Agreement. In this opinion, it is presumed for the sake of argument that the jury's finding in response to this question is sufficient to constitute a finding that Russell fraudulently induced Westergren to sign the Release Agreement based upon the fraudulent nondisclosure found by the jury in response to this question.

7

upstairs and I walked in and I was — high five. How are you doing, Gordon. Yada, yada, yada. . . he says, I got your check here. I need you to sign this. He goes — I go, What's that? He said, Oh, it's just a receipt. It's nothing. I said, Well, I'm not reading it 'cause I'm in a hurry. I don't have any glasses. He goes, oh, it's nothing. It's nothing. I signed it, handed it back to him and got my check. [Westergren snaps his fingers.] It was all that quick. And then [the notary] notarized it and we shot the corn for a few minutes. He told me, Hey, don't spend all that money until we get another building coming out of the ground. I'm not going to be able to give you the other half. Man, I said, That's fine. This is great. One of the best days of my life. And I — I ran to the bank and turned it into a cashier's check and went home and had — had a party. Had a good time.

When asked whether Russell told him that the document was a release of all claims, Westergren answered, "No, he said it was a receipt. It's nothing. You don't have to worry about it." Westergren stated that he relied upon these oral representations in signing the Release Agreement. At trial, Russell testified that he did not make these statements. Traci Koenig, the National Property employee Westergren mentioned in the above testimony, testified that in her presence nobody told Westergren that the Release Agreement was a receipt. But, even if Russell uttered those words, it would not provide a means for Westergren to avoid enforcement of the written terms of the Release Agreement.

Westergren is not the first to sign a release without reading it and then try to avoid enforcement of the release by claiming he relied upon an oral representation that the release was a receipt.[11] In *Harvey v. Elder*, a doctor performed an operation on a patient at a hospital owned by the doctor.[12] The doctor performed two more surgeries seeking to address the patient's abdominal pain.[13] During a

---

[11] *See Harvey v. Elder*, 191 S.W.2d 686, 688–89 (Tex. App.—San Antonio 1945, writ ref'd).

[12] *See id.* at 687–88.

[13] *See id.*

8

fourth surgery, a different doctor removed a two-foot-long sponge from the patient's abdomen and indicated in his report that the sponge had been left in the patient's abdomen during the first surgery.[14] On the same day that the patient showed the first doctor this report, the patient testified that the doctor called her back to his office and told her that he was releasing the promissory notes and deed of trust that she had given the doctor as payment for the second and third surgeries.[15] Without reading it, the patient signed a document in which she released of all her claims against the doctor and the hospital employees regarding the first surgery.[16] According to the patient, the doctor told her that the release document was "a receipt for me to sign," and she thought the document was a receipt for the notes that the doctor was giving back to her.[17] The patient stated that she did not intend to release any of her claims and that she would not have signed the document if she knew that it contained a release of her claims regarding the first surgery.[18] According to the patient, she signed the release without reading it in reliance on her doctor's oral representation that the document was "just a receipt."[19] The patient testified that she signed the release thinking it was a receipt, without even knowing that she was entering into a written agreement with her

---

[14] *See id.*

[15] *See id.*

[16] *See id.* at 688–89.

[17] *See id.*

[18] *See id.*

[19] *Id.* at 688. The majority seeks to distinguish the *Harvey* case on the basis that the patient told the notary that she understood the terms of the document she had not read. *See ante* at p. 24, n.22. This fact does not materially distinguish the facts of *Harvey* from the facts of this case. A notary's office is not to determine whether signatories understand the documents they are signing. Westergren, just like the patient, did not read the notarized document that he signed allegedly in reliance upon another party's representation that the document was a receipt and upon that party's failure to disclose that the document contained releases by the signatory.

9

doctor.[20]

In *Harvey*, the Supreme Court of Texas held that the evidence of the doctor's oral representations and his failure to disclose that the document contained releases by the patient was no evidence that would support a conclusion that the doctor fraudulently induced the patient to sign the release, given that the patient could have read the document to discover its terms.[21] The *Harvey* court enforced the release as a matter of law.[22] The majority does not cite cases in which courts hold that there is a fact issue as to fraudulent inducement under circumstances like those present in the today's case. In a case presenting circumstances similar to today's case, the Supreme Court of Texas held there was no evidence of fraudulent inducement.[23] This court should follow the *Harvey* case and hold that the trial court did not err in impliedly concluding that the trial evidence is legally insufficient to support a jury finding that Russell fraudulently induced Westergren to enter into the Release Agreement.[24] This result is also consistent with opinions

---

[20] *See id*. at 688–89. The majority also seeks to distinguish the *Harvey* case on the basis that the patient was aware the doctor had prepared a release of the promissory notes she had given him in payment for the second and third surgeries. *See ante* at p. 24, n.22. Significantly, the patient did not say that the doctor told her about any release in which she was releasing claims, as opposed to the doctor releasing his claims on the promissory notes. *Harvey*, 191 S.W.2d at 688–89. On the contrary, the patient said she was unaware that the document she signed contained any release by her. *See id*. The fact that the doctor was releasing claims on promissory notes as part of the transaction is not a material distinction from the facts of this case.

[21] *See id*. at 689. The Supreme Court of Texas refused the writ of error in *Harvey*. In cases decided after June 14, 1927, the Supreme Court of Texas's notation of "writ refused" or "petition refused" denotes that the court of appeals's opinion is the same as a precedent of the Supreme Court of Texas. *See Yancy v. United Surgical Partners Int'l, Inc*., 236 S.W.3d 778, 786 n.6 (Tex. 2007); *State Farm Fire & Cas. Co. v. Gandy*, 925 S.W.2d 696, 707 (Tex. 1996) (referring to a writ refused court of appeals opinion as an opinion of the Supreme Court of Texas).

[22] *See Harvey*, 191 S.W.2d at 689.

[23] *See id.* The *Harvey* court stated that the document the patient signed "was in the nature of a receipt." *Id*. In the Release Agreement, Westergren acknowledges receipt of $500,000.

[24] *See id*. The Plank Parties raised this issue in their motion for judgment notwithstanding the

from various courts of appeals, including this court, in which the courts hold as a matter of law that a contracting party cannot be defrauded into believing that a written contract contains terms contrary to the unambiguous meaning of the terms in the contract.[25]

The majority concludes the evidence is legally sufficient to support a finding that Russell fraudulently failed to disclose to Westergren that the Release Agreement Westergren was signing contained releases by Westergren. The majority concludes that Russell had a duty to make this disclosure based upon either Russell's alleged oral representations on June 30, 2006 or upon his alleged prior oral representations that he would pay Westergren $1 million and a 5% profit interest in the sale of the Property.[26] But, when fraudulent nondisclosure is based upon a statement by the defendant, the statement must be actionable as fraud; a non-actionable statement cannot be the basis of fraudulent nondisclosure.[27]

---

verdict. In this motion, they asserted that, as a matter of law, a plaintiff cannot assert fraudulent inducement based upon a misrepresentation that conflicts with the express terms of a written contract, even though the plaintiff failed to read the contract.

[25] *See DRC Parts v. VM Motori, S.p.A.*, 112 S.W.3d 854, 858 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) (en banc); *In re MHI P'ship, Ltd.*, No. 14-07-00851-CV, 2008 WL 2262157, at *3–5 (Tex. App.—Houston [14th Dist.] May 29, 2008, orig. proceeding) (mem. op.); *DeClaire v. G&B McIntosh Family Ltd. P'ship*, 260 S.W.3d 34, 46–47 (Tex. App.—Houston [1st Dist.] 2008, no pet.).

[26] *See ante* at pp. 22–24; *Bradford v. Vento*, 48 S.W.3d 749, 755–56 (Tex. 2001) (stating that whether a party has a duty to disclose is a question of law and that the Supreme Court of Texas has not yet adopted Section 551 of the Restatement (Second) of Torts).

[27] *See Allen v. Devon Energy Holdings, L.L.C.*, 367 S.W.3d 355, 371 (Tex. App.—Houston [1st Dist.] 2012, pet. granted, judgm't vacated w.r.m.). The majority suggests that the Plank Parties failed to preserve error as to whether Russell had a duty to disclose based upon his alleged affirmative misrepresentations and that the Plank Parties only challenged Russell's duty to disclose to the extent he allegedly had one because he was a fiduciary. *See ante* at p. 22 & n.21. The Plank Parties asserted in their motion for judgment notwithstanding the verdict that, as a matter of law, a plaintiff cannot assert fraudulent inducement based upon a misrepresentation that conflicts with the express terms of a written contract, even though the plaintiff failed to read the contract. The Plank Parties also asserted that there was legally insufficient evidence to support any jury finding of fraudulent misrepresentation or fraudulent nondisclosure. In

Russell's alleged affirmative statements are contrary to the unambiguous language of the Release Agreement and are not actionable fraud.[28] Accordingly, these statements cannot be the basis of an alleged fraudulent failure to disclose.[29]

For the foregoing reasons, the evidence is legally insufficient to show that Russell fraudulently induced Westergren to enter into the Release Agreement by fraudulent misrepresentations or by fraudulent failure to disclose that the Release Agreement contains releases by Westergren.[30]

---

addition, the Plank Parties cited *First City Mortgage Co v. Gillis*, 694 S.W.2d 144, 146–47 (Tex. App.—Houston [14th Dist.] 1985, writ ref'd n.r.e.), in which this court held that even a party owing a general fiduciary duty to another contracting party has no duty to disclose to the other contracting party the presence or meaning of unambiguous terms in a proposed written contract. Westergren asserted that Russell owed him a fiduciary duty, and the jury found that a partnership existed between Russell and Westergren. In this context, the Plank Parties sufficiently raised the issue of whether Russell owed Westergren a duty to disclose that the Release Agreement contained releases by Westergren, whether this alleged duty is based upon Russell's alleged fiduciary duty or upon an argument under Section 551 of the Restatement (Second) of Torts.

[28] *See Harvey*, 191 S.W.2d at 688–89; *DRC Parts*, 112 S.W.3d at 858; *In re MHI P'ship, Ltd.*, 2008 WL 2262157, at *3–5; *DeClaire*, 260 S.W.3d at 46–47. In addition, as to Russell's alleged oral representation that he would pay Westergren $1 million and a 5% profit interest in the sale of the Property, the majority has not addressed all of the Plank Parties' arguments as to why this alleged representation is not actionable fraud.

[29] *See Allen*, 367 S.W.3d at 369–76. Westergren focuses primarily on Russell's alleged statement that the document was "just a receipt." But, to the extent Westergren bases his assertion of fraudulent inducement to execute the Release Agreement on the alleged statements that the document was "nothing" or "[y]ou don't have to worry about it," these statements also are too vague to constitute an actionable fraudulent misrepresentation. *See In re Media Arts Group, Inc.*, 116 S.W.3d 900, 910 (Tex. App.—Houston [14th Dist.] 2003, orig. proceeding [mand. denied]) (holding as a matter of law that contracting party's alleged statement to the other contracting parties regarding a written agreement, "don't worry about it," was too vague to constitute an actionable representation upon which a fraudulent-inducement theory may be based to avoid enforcement of the written contract).

[30] *See Harvey*, 191 S.W.2d at 688–89; *Allen*, 367 S.W.3d at 369–76; *DRC Parts*, 112 S.W.3d at 858; *In re MHI P'ship, Ltd.*, 2008 WL 2262157, at *3–5; *DeClaire*, 260 S.W.3d at 46–47.

***C. The evidence is legally insufficient to show that Russell engaged in a trick or artifice which prevented Westergren from reading the Release Agreement or having it read to him.***

The majority also concludes that Westergren is excused from the normal consequences of failing to read the Release Agreement before signing it because Russell tricked Westergren into signing this document by failing to disclose that the Release Agreement contained releases by Westergren.[31]  But, the rule in Texas is that one who signs a release without reading it cannot rely on the "trick or artifice" exception unless he shows that he was prevented by some fraudulent trick or artifice from reading the release or having it read to him.[32]  The trial record contains no evidence of any conduct by Russell that prevented Westergren from reading the Release Agreement or having it read to him.

This court should be asking what, if anything, Russell did to block Westergren from reading the document.[33]  The majority instead focuses on what

---

[31] *See ante* at pp. 23–24, n.22.

[32] *See Harvey*, 191 S.W.2d at 689 (holding that doctor's oral representation that document was a receipt and his failure to disclose that it contained releases of the patient's claims, as a matter of law, did not constitute a "trick or artifice" which prevented the patient from reading the release before signing it); *Indemnity Ins. Co. of No. Am. v. W.L. Macatee & Sons*, 101 S.W.2d 553, 556–57 (Tex. 1937) (holding that employer did not engage in a "trick or artifice" which prevented its employees from reading an assignment document attached to the normal document signed by the employees before being paid their wages, even though the employer did not disclose that this assignment was part of the document signed by the employees, the assignment was on the first page and the employees were presented with the document folded over to the page containing the signature block, and one employee testified that he did not intend to assign any of his claims); *In re MHI P'ship, Ltd.*, 2008 WL 2262157, at *5 (holding that homebuilder did not engage in a "trick or artifice" which prevented the homeowners from reading the contract they signed, even though homeowners testified that homebuilder's representatives told homeowners that there was no time for the homeowners to read the contract and that it was not necessary for the homeowners to read the contract); *Brown v. Aztec Rig Equip., Inc.*, 921 S.W.2d 835, 846 (Tex. App.—Houston [14th Dist.] 1997, writ denied) (holding there was no fact issue regarding "trick or artifice" exception because there was no evidence raising a fact issue as to whether company engaged in conduct which prevented the homeowners from reading the contract they signed).

[33] *See Harvey*, 191 S.W.2d at 689; *Indemnity Ins. Co. of No. Am.*, 101 S.W.2d at 556–57; *In re MHI P'ship, Ltd.*, 2008 WL 2262157, at *5; *Aztec Rig Equip., Inc.*, 921 S.W.2d at 846.

13

Russell allegedly said that was inconsistent with the terms of the writing. Because the majority asks the wrong question, it gets the wrong answer.

The key inquiry is whether Russell was afforded the opportunity to read (or have read to him) the document he was signing, not whether Russell's alleged statements about the document's contents were accurate.[34] Westergren does not allege, and the majority does not conclude, that he was in any way prevented from reading the Release Agreement. He chose not to do so.

The majority suggests that Russell had a duty to give attorney Robert Langston a copy of the Release Agreement and that Russell acted improperly in communicating and dealing directly with Westergren regarding the Release Agreement because Russell allegedly knew Langston was Westergren's attorney for matters relating to the Property.[35] Langston represented Westergren in the lawsuit regarding the Property, but that lawsuit settled in January 2006, when Westergren and others signed the Mediation Settlement Agreement. Westergren released his lis pendens on the Property and released all claims arising from or relating to the events which were the subject matter of that lawsuit. The lawsuit was dismissed in early 2006. Though Langston testified that his representation of Westergren regarding this lawsuit had not terminated as of June 30, 2006 (the day Westergren signed the Release Agreement), Langston also testified that he had not performed any services for Westergren in this representation since the lawsuit was dismissed in early 2006.

During trial Langston briefly testified that among "attorneys representing people in litigation" the "custom and practice about how you go about communicating with a party that you know to be represented by legal counsel" is

---

[34] *See Harvey*, 191 S.W.2d at 689; *Indemnity Ins. Co. of No. Am.*, 101 S.W.2d at 556–57; *In re MHI P'ship, Ltd.*, 2008 WL 2262157, at *5; *Aztec Rig Equip., Inc.*, 921 S.W.2d at 846.

[35] *See ante* at pp. 21–24.

14

that "lawyers cannot deal with the other guy's client," and "[y]ou have to deal strictly with the lawyers for that client." Langston did not testify as to any custom and practice regarding represented clients communicating directly with one another with no attorneys present. Langston did not testify that Russell had a duty to communicate with Langston regarding the Release Agreement or to obtain Langston's consent before communicating with Westergren in this regard. Langston did not testify that Russell had a duty to give Langston a copy of the Release Agreement before presenting it to Westergren. And, Westergren did not argue in the trial court that Russell had any of these duties or that it was legally impermissible for Russell to communicate or deal directly with Westergren regarding the Release Agreement. Westergren has not advanced any such argument in this appeal, and the majority has not cited any authority in support of its analysis in this regard. In any event, Russell's failure to communicate with Langston and his failure to give Langston a copy of the Release Agreement did not prevent Westergren from reading the Release Agreement.

The two reasons Westergren cited for signing without reading — "*I'm in a hurry*" and "*I don't have any glasses*"— are tied to his own choices, not to any conduct by Russell or the Plank Parties and certainly not to any trick or artifice. No one prevented Westergren from reading the document or from getting his eyeglasses or from using his magnifier or from having the two-page Release Agreement read aloud to him. Westergren voluntarily forfeited these opportunities. Consequently, there is no legal basis for the majority's conclusion that the "trickery or artifice" exception applies and provides a basis to conclude that the evidence is legally sufficient to support a jury finding that Russell fraudulently induced Westergren to enter into the Release Agreement.[36]

---

[36] *See Harvey*, 191 S.W.2d at 689; *Indemnity Ins. Co. of No. Am.*, 101 S.W.2d at 556–57; *In re*

15

***D. The majority errs by concluding the evidence is legally sufficient to support a finding that Westergren did not have an equal opportunity to discover whether the Release Agreement contained releases by Westergren.***

The majority concludes that the evidence is legally sufficient to support a finding that Westergren did not have an equal opportunity to discover whether the Release Agreement contained releases by Westergren based upon evidence that Westergren did not have his reading glasses with him and that Westergren could not read this document without assistance. The majority cites no case that supports this notion, and it is contrary to the fact, reflected by the evidence at trial, that Westergren, an experienced businessperson, had the same opportunity that any other contracting party has to discover the terms of the document the party is signing—by reading the document or having it read to him.[37]

The evidence shows that Westergren had the opportunity to read the Release Agreement before signing it. He chose not to do so.[38] Whether by using the magnifying glass that he had with him or by retrieving his reading glasses, or by having the document read aloud to him, as a matter of law, Westergren had an equal opportunity to discover the terms of the Release Agreement before he signed it. That Westergren could not read the document without a vision enhancer does not differentiate his case from that of one who can read the document unaided yet

---

*MHI P'ship, Ltd.*, 2008 WL 2262157, at *5; *Aztec Rig Equip., Inc.*, 921 S.W.2d at 846.

[37] *See Harvey*, 191 S.W.2d at 689; *DeClaire*, 260 S.W.3d at 46 (stating that "a party to an arm's length transaction must exercise ordinary care and reasonable diligence for the protection of his own interests, and a failure to do so is not excused by mere confidence in the honesty and integrity of the other party").

[38] The majority also concludes that Westergren did not have an equal opportunity to discover the truth because Russell did not provide Westergren's attorney with a copy of the Release Agreement before presenting this document to Westergren. The majority cites no evidence or legal authorities showing the Russell had a duty to send this document to Westergren's attorney. In any event, Westergren was free to seek advice of counsel regarding this document either before or after reading the document. Instead, he chose not to read the document and not to seek advice of counsel.

chooses not to do so. The majority's reasoning conflicts with cases holding that an alleged oral statement that a contract has terms different from its actual terms does not provide a basis for a party to avoid the consequences of his failure to read the contract at the time of execution.[39]

Westergren has no vision restrictions on his driver's license and he drove himself to the appointment with Russell. Westergren did not state that he needed his glasses or that he could not read the Release Agreement. Nor did Westergren request additional time so that he could take whatever steps may have been necessary for him to read the document.[40] Like any other contracting party, Westergren had an equal opportunity to discover the terms of the Release Agreement by reading it or having it read aloud to him. There is no evidence that Russell pressured Westergren to sign the Release Agreement without reading it or that Russell encouraged Westergren not to read the document. The majority makes an unwarranted distinction between people who use vision enhancers and people who do not. Under the majority's analysis, those in the first group are not bound by the unambiguous language of contracts they sign if they choose not to use their vision enhancers or to have the document read aloud, whereas those in the second group who do not need vision enhancers for reading are bound by the unambiguous

---

[39] *See Harvey*, 191 S.W.2d at 689; *In re Lyon Financial Servs.*, 257 S.W.3d 228, 230–32 (Tex. 2008) (concluding that contracting party was still bound by terms of written contract despite false oral representation to the contracting party that the forum-selection clause did not apply) (per curiam); *In re MHI P'ship, Ltd.*, 2008 WL 2262157, at *3–5 (holding that homeowners were still bound by terms of their written contract despite alleged false oral representations by the homebuilder regarding the terms of the contract and despite alleged statements by the homebuilder that there was no time for the homeowners to read the contract and that it was not necessary for the homeowners to read the contract); *DeClaire*, 260 S.W.3d at 46–47 (holding that alleged oral representation that written contract had terms different from the actual terms in the document did not allow other party to avoid enforcement of the actual contract terms under fraudulent-inducement theory).

[40] *See In re MHI P'ship, Ltd.*, 2008 WL 2262157, at *5 (noting that homeowners did not ask for additional time to read the contract).

language in the contracts, even if they do not read the document or have it read aloud to them.

The majority errs in concluding the evidence is legally sufficient to support a finding that Russell fraudulently induced Westergren to sign the Release Agreement because, among other things, the trial evidence is legally insufficient to support a finding that Westergren did not have an equal opportunity to discover whether the Release Agreement contained releases by Westergren or that Russell knew that Westergren did not have an equal opportunity to discover this truth.[41]

For the reasons stated in Sections I.B., I.C., and I.D. of this opinion, the evidence is legally insufficient to support a jury finding that Russell fraudulently induced Westergren to enter into the Release Agreement. Therefore, this court should address the effect of the unambiguous terms of the Release Agreement in the partial-performance analysis. As shown in Section I.A. of this opinion, if the Release Agreement is considered in this analysis, the evidence is legally insufficient to support the jury's finding in response to Question 3. Therefore, the trial court did not err in disregarding the breach-of-contract findings and in rendering judgment that Westergren take nothing as to his breach-of-contract claim.

## II. The trial court erred in rendering a take-nothing judgment as to the claims for breach of partnership duties, common-law fraud, and statutory fraud.

In his second and third issues, Westergren asserts that the trial court erred in rendering judgment notwithstanding the verdict as to Westergren's claims for breach of partnership duties, statutory fraud, and common-law fraud (collectively

---

[41] *See Bradford*, 48 S.W.3d at 755–56.

the "Tort Claims").[42] In their motion, the Plank Parties asserted various grounds regarding the Tort Claims, including the argument that these claims fail under the statute of frauds because the jury's damage findings are based upon a benefit-of-the-bargain measure of damages. In their motion, the Plank Parties cited cases in which the Supreme Court of Texas has held that, if the statute of frauds bars a plaintiff from recovering under a breach-of-contract claim, then the statute of frauds also bars the plaintiff from recovering benefit-of-the-bargain damages based upon fraud claims.[43] This rule has been applied generally to all tort claims.[44] Under this authority, Westergren may not use any of the Tort Claims as a means to recover benefit-of-the-bargain damages.

The jury's damage findings regarding the Tort Claims were based upon the same measure of damages used in the damage question for the breach-of-contract claim. The jury's damage findings regarding the Tort Claims were based upon the following measure of damages: "[t]he difference, if any, between the amount Westergren received from the [Plank Parties] and the amount he would have received if the [Plank Parties] had paid him the agreed upon amount." This is a

---

[42] In response to Question 19, the jury declined to find any damages resulting from any fraud committed by the Plank Parties. The trial court granted the Plank Parties' motion to disregard the fraud liability findings. But neither the Plank Parties nor Westergren asked the trial court to set aside the jury's finding in response to Question 19. Westergren did not move the trial court to render judgment in his favor based upon the fraud claims. In this context, the trial court's judgment would appear to be a judgment on the jury's verdict as to the fraud claims, rather than a judgment notwithstanding the verdict. For the purposes of this analysis, it is presumed that the jury's finding in response to Question 19 and Westergren's failure to challenge this finding in the trial court do not preclude Westergren from successfully challenging the trial court's judgment as to the fraud claims.

[43] *See Baylor Univ. v. Sonnichsen*, 221 S.W.3d 632, 636 (Tex. 2007) (per curiam); *Haase v. Glazner*, 62 S.W.3d 795, 799 (Tex. 2001).

[44] *See Hugh Symons Group, PLC v. Motorola, Inc.*, 292 F.3d 466, 470 (5th Cir. 2002) (applying Texas law); *Lam v. Nguyen*, 335 S.W.3d 786, 791–92 (Tex. App.—Dallas 2011, pet. denied); *Bank of Texas, N.A. v. Gaubert*, 286 S.W.3d 546, 556–57 (Tex. App.—Dallas 2009, pet. dism'd w.o.j.).

benefit-of-the-bargain measure of damages, and thus, the only damages that could have been found by the jury as to the Tort Claims are benefit-of-the-bargain damages.[45] Because Westergren may not recover benefit-of-the-bargain damages, the trial court did not err in rendering judgment that Westergren take nothing as to the Tort Claims.[46] For these reasons, this court should address and overrule Westergren's second and third issues.[47]

## III. The trial court did not reversibly err in denying Westergren leave to amend his pleadings.

In his fourth issue, Westergren asserts that the trial court abused its discretion in denying him leave to amend his petition during trial to plead that the January 2006 Mediation Settlement Agreement failed for lack of consideration. Presuming, without deciding, that the trial court so erred, any such error did not

---

[45] *See Clear Lake City Water Auth. v. Friendswood Dev. Co.*, 344 S.W.3d 514, 523 (Tex. App.— Houston [14th Dist.] 2011, pet. denied).

[46] *See Haase*, 62 S.W.3d at 799; *Sonnichsen*, 221 S.W.2d at 636; *Hugh Symons Group, PLC*, 292 F.3d at 470; *Lam*, 335 S.W.3d at 791–92; *Gaubert*, 286 S.W.3d at 556–57. In his briefing, Westergren states that, if this court were to affirm the trial court's judgment as to the breach-of-contract and breach-of-partnership-duties claims, a new trial might be necessary as to Westergren's fraud damages because Westergren would have filed a motion for new trial complaining of the inadequate fraud damages found by the jury if the trial court had not disregarded the fraud liability findings in rendering its judgment. Presuming for the sake of argument that Westergren is seeking a new trial based upon an allegedly inadequate finding of damages in response to Question 19, and presuming that Westergren was not required to assert this argument in the trial court in a motion for new trial, it still would be inappropriate to grant this relief because Westergren may not recover benefit-of-the-bargain damages. *See Haase*, 62 S.W.3d at 799; *Sonnichsen*, 221 S.W.2d at 636.

[47] On appeal, Westergren does not argue that the trial court reversibly erred in denying Westergren's "Motion for Disgorgement of Profits from Breaching Fiduciary." In his briefing, Westergren discusses various issues regarding the disgorgment remedy that he sought in the trial court. Westergren asserts that, if this court were to reverse the trial court's judgment as to the breach-of-partnership-duties claim or as to the fraud claims, and regardless of whether there will be a new trial to determine fraud damages, this case should be remanded for "a determination of whether the [Plank Parties] should be required to disgorge some or all of their ill-gotten gains." If this court were to overrule Westergren's first three issues, it would not be reversing the trial court's judgment as to the breach-of-partnership-duties claim or as to the fraud claims; therefore, the condition precedent to Westergren's request would not have been triggered.

probably cause the rendition of an improper judgment or probably prevent Westergren from properly presenting the case to this court.[48]  Accordingly, this court should address and overrule Westergren's fourth issue.

## IV. Westergren failed to preserve error as to his contention that the trial court erred in awarding costs.

In his fifth issue, Westergren asserts that the trial court should not have awarded all of the court costs to the Plank Parties.  Westergren failed to voice this complaint in the trial court and therefore has not preserved error.[49]  Accordingly, this court should overrule Westergren's fifth issue.

## V. This court should overrule Westergren's appellate issues and affirm the trial court's judgment.

As to the Plank Parties' motion to disregard jury findings regarding the breach-of-contract claim, the evidence is legally insufficient to support the jury's finding in response to Question 3.  Accordingly, the trial court did not err in disregarding the jury's breach-of-contract findings and in rendering judgment that Westergren take nothing as to his breach-of-contract claim.

Because the statute of frauds bars Westergren from recovering under his breach-of-contract claim, the statute of frauds also bars Westergren from recovering benefit-of-the-bargain damages based upon his Tort Claims.  And, because the only damages that could have been found by the jury as to the Tort Claims are benefit-of-the-bargain damages, the trial court did not err in rendering judgment that Westergren take nothing as to the Tort Claims.  Even if the trial court had erred in denying Westergren leave to amend his petition during trial, the

---

[48] *See* Tex. R. App. P. 44.1(a); *Merckling v. Curtis*, 911 S.W.2d 759, 771 (Tex. App.—Houston [1st Dist.] 1995, writ denied).

[49] *See Cobb v. Morace*, No. 01-07-01036-CV, 2009 WL 2231909, at *8 (Tex. App.—Houston [1st Dist.] Jul. 23, 2009, no pet.) (mem. op.); *Weinberger v. Longer*, 222 S.W.3d 557, 566–67 (Tex. App.—Houston [14th Dist.] 2007, pet. denied).

error would be harmless. Westergren failed to preserve error regarding his complaint that the trial court erred in awarding court costs.

For these reasons, this court should overrule Westergren's appellate issues and affirm the trial court's judgment.[50]

/s/     Kem Thompson Frost
Justice

Panel consists of Justices Frost, Christopher, and McCally.   (Christopher, J., majority).

---

[50] I agree with the majority's analysis and disposition of the Plank Parties' two cross-issues. The Plank Parties assert a conditional cross-point in the event this court should reverse the trial court's judgment that Westergren take nothing as to his claims.  If the court were to affirm this judgment, it would not need to address this conditional cross-point.